517 A.2d 192

COMMONWEALTH of Pennsylvania

v.

Daniel Mark HOWARD, Appellant.

Superior Court of Pennsylvania.

Submitted June 24, 1986.

Filed Nov. 5, 1986.

Spero T. Lappas, Harrisburg, for appellant.

William A. Behe, Chief Deputy District Attorney, Harrisburg, for Com., appellee.

Before WIEAND, BECK and WATKINS, JJ.

WATKINS, Judge:

This is an appeal from the judgment of sentence of the Court of Common Pleas of Dauphin County. On April 19, 1984, 21–year–old Tammy Lynn Howard was found stabbed to death in the second-floor bedroom of her home in Lower Swatara Township, Dauphin County. On April 24, 1985, a jury found appellant, her husband, guilty of first degree

murder [1] in connection with the homicide, but was unable to reach a verdict in the penalty phase of the proceedings. Appellant was sentenced to life imprisonment in accordance with the provisions of 42 Pa.C.S.A. § 9711(c)(1)(v) (Purdon 1985 supp.). Post-verdict motions were filed and denied, resulting in this appeal.

Appellant and the victim were married on May 15, 1982, and their son was born on December 31, 1983. Appellant was an assistant warehouse manager at a sporting goods wholesaler and the victim worked for ITT. Shortly after the birth of their son, appellant began working an evening shift, which was apparently a source of friction in the marriage. In early April, 1984, appellant approached 19–year–old Robert Bittinger, a temporary employee of the wholesaler, and asked him if he knew anyone who could kill a person for him. After continued discussions, Bittinger agreed to commit the murder in return for $500.00 cash, weapons from the warehouse, and a full-time job. Initially, Bittinger was unaware of the identity of the intended victim, but appellant eventually told him that the victim was to be his wife.

On the morning of April 18, 1984, Bittinger went to appellant's home. Appellant was there, as were his son and Vicki Snyder, a temporary employee of the warehouse with whom appellant was having an affair. At that time, Bittinger and appellant discussed how the crime was to be committed and that it had to take place that night.

At 9:30 P.M. on April 18, 1984, appellant told Bittinger that he should leave work and accomplish the task. Appellant gave Bittinger the key to his front door. Bittinger retrieved his coat, motorcycle helmet, gloves and boot knife. He told a co-worker that he was going to see his girlfriend who had hurt her leg. He left work without punching out.

Upon arriving at appellant's residence, Bittinger used the key to open the front door and entered the house. He went up to the bedroom, opened the door, walked in, and saw that

---

1. Appellant was also found guilty of criminal conspiracy and solicitation.

appellant's wife was on the right side of the bed as appellant had said she would. He turned on the light and appellant's wife jumped up. Bittinger told her that Danny had sent him to get something, but he could not remember what it was. She asked how he got in and he said appellant had given him his key. When the victim tried to phone appellant, Bittinger made her hang up. Bittinger bound her hands, tied her legs, and gagged her mouth. He removed the paper money from the baby's bank, took a cameo ring and buck knife from a dresser drawer and then started stabbing appellant's wife and slit her throat. He did not ransack the house as planned, nor did he rape appellant's wife. He did slit the back of her underwear to make it look as if she had been sexually assaulted.

Bittinger returned to work and told appellant it had been "taken care of". After work, appellant went home to the scene of the murder. At approximately 12:30 A.M. on the morning of April 19, two police officers from the Lower Swatara Police Department, after receiving a call that there had been a murder, proceeded to appellant's address. When they arrived, appellant was sitting on the sofa, smoking a cigarette and watching television. He told them that his wife, was upstairs in the bedroom. The officers went upstairs where they found the bedroom in a state of disarray, with dresser drawers open to about the same width, a lamp knocked over, and an open cigar box on the floor. Lying on the floor at the foot of the bed was the appellant's wife.

The investigation immediately centered upon Bittinger because police learned that he had left work that night and his alibis proved to be false. Their attention was eventually drawn to appellant because he gave several inconsistent, increasingly incriminating statements to police during the course of the investigation. In his initial interview with police on April 19, 1984, appellant told them he had no idea who had killed his wife. On September 5, 1984, he told police he had once asked Bittinger to scare his wife so she would not leave him. On September 18, 1984, he told police

he asked Bittinger to scare her, slap her around a little bit, but not to hurt her. When Bittinger returned to work on the night of the murder with blood on his sleeve, it did not occur to appellant that something had happened to his wife. On September 19, the appellant told police that he did not know where Bittinger had gone when he left work on the night of the murder, but after he failed to return within fifteen minutes, he was almost sure what Bittinger was doing. On October 1, 1984, appellant admitted that he had given Bittinger his house key on the night of the murder. On October 10, appellant told the police that he and Bittinger had discussed murdering appellant's wife, but when he gave Bittinger the key on the night of the murder, he told him to "just teach her a lesson". Appellant was arrested for the murder of his wife on October 11, 1984.

Appellant argues that the trial court erred in denying his motion to vacate the plea of Robert Bittinger and exclude Bittinger's testimony at his trial. Before appellant's trial, Bittinger admitted his responsibility for killing appellant's wife by pleading guilty to first degree murder and criminal conspiracy. In exchange for his truthful testimony against the appellant, the Commonwealth agreed not to seek the death penalty for Bittinger's acknowledged guilt as a hired killer. Appellant argues that the plea bargain was illegal and, therefore, Bittinger's testimony should have been excluded.

 Daniel Mark Howard, the appellant in this case, has no standing to challenge the plea of guilty entered by Robert Bittinger. If the agreement were in violation of the provisions of § 9711 of the Sentencing Code, 42 Pa.C.S. § 9711 as appellant contends, the right to complain of such is singularly Bittinger's.[2] The appellant cannot prevent

2. Appellant cites 42 Pa.C.S. § 9711, which provides the procedure to be followed in the sentencing phase of first degree murder cases Subsection (b) provides that, if a defendant has pled guilty to first degree murder, a jury shall be impaneled for the purpose of determining whether the penalty should be death or life imprisonment. Due to this provision appellant argues that the District Attorney has no

Bittinger's testimony from being introduced against him unless some recognized constitutional right of Howard's has been violated. After the jury had heard Bittinger's testimony and Howard had had an opportunity to challenge its credibility by showing Bittinger's interest and potential expectation of favorable treatment as a result of his guilty plea, the weight and believability of his testimony were for the Howard jury to determine. Appellant cannot challenge the validity of Bittinger's guilty plea merely because Bittinger thereafter implicated appellant in the homicide.

Appellant also argues that the trial court erred in admitting into evidence photographs of the dead victim. Two such pictures were admitted into evidence. One was a photograph of the dresser; the victim's head and blood-stained back were visible. The other was a photograph of the full body and the open cigar box. Again, the blood stain on the victim's back was visible, as was the slit in her underwear.

This Court has adopted a two-part test for determining whether to admit potentially inflammatory photographs:

> To determine whether such photographs are admissible, we have utilized a two-tiered analysis. The trial judge must initially decide whether the photographs possess inflammatory characteristics. If they do not, the photographs are admissible as are any evidentiary items, subject to the qualification of relevance ... If the photographs are deemed inflammatory, then the trial judge must decide whether the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of their inflaming the passions of the jurors.

discretion to offer life imprisonment in exchange for a guilty in first degree murder cases.

The decision as to whether to enter into plea negotiations is a function of prosecutorial discretion. *Commonwealth v. Stafford,* 272 Pa.Superior Ct. 505, 416 A.2d 570 (1979). Section 9711 of the Sentencing Code is simply the codification of the procedure to be employed in those cases where the Commonwealth refuses to plea bargain, has obtained a first degree murder conviction, and is seeking the death penalty.

■ *Commonwealth v. Hudson,* 489 Pa. 620, 630, 414 A.2d 1381, 1386 (1980) (citations omitted). The photographs in this case are not inflammatory and are therefore properly admissible. They showed the back of the corpse. The victim's face, her slit throat, and her chest wounds were not shown. One could see a blood stain on the victim's clothed back, but the blood was not present in profusion and the stab wounds themselves were not visible. One could also see the slit in the victim's underwear and part of her buttocks was exposed, but not to such a degree as to render the photograph inflammatory. We find no abuse of discretion in the trial court's analysis and no error in admitting the photographs into evidence.

Appellant's next argument is that the trial court erred in denying his motion for the bifurcation of trial with separate juries, one to determine guilt, the other to determine penalty. In support of his motion, appellant had argued that a "death-qualified jury" can be reasonably predicted to be conviction prone. Therefore, there should be two juries for the two distinct phases of the trial.

■ Our Supreme Court has held that "simply questioning potential veniremen on their position regarding the death penalty, or excluding those who are strongly opposed to it and cannot impose it under any conditions, does not necessarily produce a prosecution oriented jury." *Commonwealth v. Maxwell,* 505 Pa. 152, 165, 477 A.2d 1309, 1316 (1984); *Commonwealth v. Colson,* 507 Pa. 440, 490 A.2d 811 (1985). Furthermore, there is no provision in either Pennsylvania law or the Rules of Criminal Procedure for the empaneling of two separate juries in a first degree murder case. Therefore, the trial court did not err in denying appellant's motion.

Appellant's next argument is that the trial court erred in denying his motion for a change of venue. He asserts that pre-trial publicity peaked shortly before his trial with the arrest and guilty plea of Robert Bittinger and that much of the publicity concerning Bittinger involved details of the Commonwealth's case against him. He argues that a

change of venue should have been granted to insure the seating of a jury which had not been exposed to extensive coverage.

"Our cases make it clear that an application for a change of venue is addressed to the sound discretion of the trial court, and its exercise of discretion will not be disturbed by an appellate court in the absence of an abuse of discretion." *Commonwealth v. Casper*, 481 Pa. 143, 150, 392 A.2d 287, 291 (1978), (citing numerous cases). In reviewing the trial court's decision, the only legitimate inquiry is whether a juror formed a fixed opinion of the defendant's guilt or innocence as a result of the pre-trial publicity. *Commonwealth v. Holcomb*, 508 Pa. 425, 498 A.2d 833 (1985). Generally, a defendant must demonstrate that the pre-trial publicity resulted in actual prejudice in the empaneling of the jury before a claim such as this will be successful. In some instances, however, "there can be pre-trial publicity so sustained, so pervasive, so inflammatory, and so inculpatory as to demand a change of venue without putting on the defendant any burden of establishing a nexus between the publicity and actual jury prejudice." *Commonwealth v. Frazier*, 471 Pa. 121, 127, 369 A.2d 1224, 1227 (1977), citing *Commonwealth v. Pierce*, 451 Pa. 190, 303 A.2d 209, *cert. denied*, 414 U.S. 878, 94 S.Ct. 164, 38 L.Ed.2d 124 (1973).

> The proper examination to be made by the trial court faced with a request for a change of (venire) charging that pretrial publicity will deny the accused's right to be tried by an impartial jury, is to first look at the *nature of the content* of the publicity. Does it contain references to the accused's prior record or criminal convictions, if any? Does it expose potential jurors to any confessions or admissions of guilt allegedly made by the accused? Does it point to the accused's guilt in terms that go beyond objective news reporting and enter the realm of the emotional and of the inflammatory? If the court answers any of these questions in the affirmative, its analysis must proceed to a determination of the likelihood

that a significant number of the prospective jurors in the county were, in fact, exposed to such publicity. If the trial court answeres "Yes" to any of the above three questions concerning the content of the pretrial publicity, and if the record shows that there is a likelihood that a significant portion of the population was exposed to publicity of that nature, refusal to grant a change of venue would be an abuse of discretion unless the record also indicates that a sufficiently long period of time has passed between the time of the publicity and the time of the application for a change of venue for the court to conclude that any prejudice which may have been initially created by the publicity has been dissipated.

*Commonwealth v. Frazier*, supra, 471 Pa. at 131–132, 369 A.2d at 1220–2130 (emphasis in original)

■ The publicity which accompanied this homicide was remarkably limited and generally factual and objective. The most serious problem with the media coverage in this case concerns the coverage of Bittinger's guilty plea, approximately one month before appellant's trial. Such publicity so close to the trial could result in prejudice. However, the publicity here involved was basically objective and factual and cannot be said to have been inflammatory or slanted towards conviction of appellant.

Although the trial court found that the media coverage was not inherently prejudicial, further steps were taken to insure that appellant received a fair trial by a jury, which had not been prejudiced. The trial court conducted an extensive individual voir dire of the prospective panel. A few jurors indicated that they had heard about the case, but further questioning revealed that they knew only the underlying facts. Each juror who indicated that he had read or heard about the case was examined with regard to whether or not he had formed a fixed opinion as to appellant's guilt or innocence as a result of the publicity. Any juror who indicated that he had a fixed opinion was challenged for cause, and each such challenge was sustained by the trial

court. Therefore, an impartial jury was, in fact impaneled and appellant has failed to establish any actual prejudice.

Appellant's next argument is that the trial court erred in its charge to the jury with respect to accomplice liability. He argues that the charge did not properly inform the jury of the necessary coincidence of mens rea and actus reas; that the jury should have been instructed that he must have had the specific intent to kill on the night of April 18, 1984, at the time that the murder occurred, and not at some previous time.

Appellant's argument is an incorrect statement of the law. Under 18 Pa.C.S.A. § 306(a), a person is guilty of an offense committed by another person if he is legally accountable for the conduct of that person. A person is legally accountable for the conduct of another person if he is an accomplice of that other person, that is, if, with the intent of promoting or facilitating the commission of an offense, he solicits that person to commit the offense or aids, agrees or attempts to aid that person in planning or committing it. 18 Pa.C.S.A. § 306(b)(3) and (c)(1), *Commonwealth v. Orlowski*, 332 Pa.Superior Ct. 600, 481 A.2d 952 (1984). Once that bond is formed, one person can change his mind without obviating his liability as an accomplice. His responsibility ends only if he terminates his complicity prior to the commission of the offense and (1) wholly deprives it of effectiveness in the commission of the offense, or (2) give timely warning to law enforcement authorities or otherwise makes proper effort to prevent the commission of the offense. 18 Pa.C.S.A. § 306(f)(3).

In the instant case, even under appellant's version of the events, he is not relieved of responsibility as an accomplice. His duty under the law was to, not only terminate his complicity, but to otherwise take steps to prevent the commission of the crime. This he failed to do. To the contrary, he took a further step by giving Bittinger the key to his home. His alleged simultaneous admonition to Bittinger not to kill his wife was insufficient to negate their shared

intent. Based upon the facts and the law, the trial court's instruction on accomplice liability was proper.

Appellant argues that the trial court erred by: (1) denying his pre-trial motion to suppress statements made to the police; (2) overruling his objections to the hearsay testimony of the arresting officer; and (3) denying his pre-trial motion in limine to exclude Bittinger's testimony on the basis that the testimony resulted from Bittinger's detention under an improperly issued material witness order. These arguments have been considered carefully by the trial court, and there is nothing to be added to the learned discussion appearing in the court's opinion.

Based on the foregoing, the judgment of sentence is affirmed.