561 A.2d 719

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**William WALLACE, Jr., Appellant.**

Supreme Court of Pennsylvania.

Argued March 8, 1988.

Decided July 5, 1989.

298

300

Thomas O. Vreeland (court-appointed), Washington, for appellant.

John C. Pettit, Dist. Atty., Dennis M. Makel, Asst. Dist. Atty., Washington, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and STOUT, JJ.

## OPINION

McDERMOTT, Justice *.

A jury found the appellant, William Wallace, Jr., guilty of murder in the first degree,[1] murder in the second degree,[2] robbery,[3] and criminal conspiracy to commit robbery and criminal homicide.[4] After further deliberation, that same jury rendered a verdict of death for the first degree murder conviction.[5] Post trial motions were denied and the judgment of sentence was entered on April 14, 1987. A consecu-

* This case was reassigned to this writer.

1. 18 Pa.C.S., §§ 2501; 2502(a).

2. 18 Pa.C.S., §§ 2501; 2502(b).

3. 18 Pa.C.S., § 3701.

4. 18 Pa.C.S., § 903.

5. 42 Pa.C.S., § 9711.

tive sentence of life was imposed on the appellant for the second degree murder conviction. A concurrent sentence of five to ten years was entered on the conspiracy conviction. The robbery conviction was merged with the the second degree murder conviction and no sentence was imposed on that conviction. Appellant directly appeals the judgment of sentence.[6]

The events giving rise to this action began on August 17, 1979, when at approximately 5:20 P.M., two men holding handguns, were observed running from Carl's Cleaners in Cannonsburg, Washington County, Pennsylvania. Moments later, Carl Luisi, Sr., the owner of Carl's Cleaners, and Tina Spalla, a fifteen (15) year old employee of Mr. Luisi, were found lying on the floor of the store. Both had been shot. Carl Luisi, Sr., had been shot twice, once in the stomach and once in the back. Tina Spalla, was shot once, through the heart. Both died, for a sum of $227.05 stolen that day.

An anonymous phone call was received by the Cannonsburg Police Department which provided a licence plate number and description of a vehicle seen leaving the crime. Several other witnesses gave statements confirming the presence of the same vehicle in the area. Based upon that information, the Cannonsburg Police Department issued a bulletin to other police departments to look for the vehicle. On August 20, 1979, members of the Wheeling, West Virginia, Police Department, located the vehicle in question and following a stake out, arrested the appellant. A second individual later identified as Henry Brown, the owner of the vehicle, was observed but eluded the police. Brown was subsequently arrested and eventually plead guilty to charges stemming from the robbery-murder.

This appeal represents appellant's third jury trial on the charges of first and second degree murder, robbery, and criminal conspiracy stemming from the robbery and murders. The first trial resulted in a mistrial due to the jury's inability to reach a verdict. The second trial resulted in the

6. *See* 42 Pa.C.S., §§ 722(4); 9711(h)(1). Pa.R.A.P. § 702(b).

jury convicting the appellant of murder in the first degree for the death of Tina Spalla, murder in the second degree for the death of Carl Luisi, Sr., robbery and criminal conspiracy. The jury sentenced the appellant to death for the first degree murder conviction. Subsequently we reversed that jury's verdict and ordered a new trial. *Commonwealth v. Wallace,* 500 Pa. 270, 455 A.2d 1187 (1983). In the third trial, as noted above, the jury reached the same verdict reached by the jury in the second trial.

Before addressing the specific issues raised by the appellant, an independent review of the record [7] reveals that there is overwhelming evidence which if accepted by the jury, would establish with almost virtual certainty that the appellant not only participated in the robbery and killed Carl Luisi, Sr., but also that he intentionally killed fifteen (15) year old Tina Spalla to cover up his killing of Mr. Luisi and the robbery. At trial, five witnesses testified that they saw an automobile matching Brown's in the Cannonsburg area during the day in question, at the time of the robbery. Four of them later identified Brown's car as the one they saw that day, from a number of cars parked at the Washington State Police Barracks. Also, three gave descriptions of the two occupants of the car they saw which matched the general characteristics of the appellant and Brown. Two other witnesses testified that they had observed two individuals having the same general characteristics as the appellant and Brown, running from Carl's Cleaners right before the killings were discovered. Further, these witnesses testified that the individual matching the appellant, was wearing a tan knee-length trench coat, similar to the one owned

7. It is the practice of this Court in cases in which a death penalty has been imposed to review the sufficiency of the evidence supporting an appellant's conviction. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 26–27, n. 3, 454 A.2d 937, 942, n. 3 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). The test for determining the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the Commonwealth as the verdict winner and drawing all proper inferences favorable to the Commonwealth, the jury could reasonably have determined all elements of the crime to have been established beyond a reasonable doubt. *Commonwealth v. Syre,* 507 Pa. 299, 489 A.2d 1340 (1985).

by the appellant.[8] One of these witnesses also testified the individuals he saw running from the cleaners were carrying handguns.

Anita Johnson, the girlfriend of Brown, testified that Brown owned a .38 caliber handgun and the appellant owned a .32 caliber handgun. Further she testified that she was with both Brown and the appellant on the morning of August 17, 1979, and that at that time, they had their guns with them and that the appellant was wearing his trenchcoat. She also testified that the two left together that day in Brown's car and that she did not see either until Brown returned on the evening of August 20, 1979.

Ms. Johnson's testimony was significant because it was established through earlier testimony that both victims died as a result of being shot with a .32 caliber gun and the description of dress of the appellant on the day of the murders. Dr. Ernst L. Abernathy, the pathologist who performed the autopsies of the victims, testified that on August 18, 1979, he removed two bullet slugs from the body of Mr. Luisi and one from the body of Ms. Spalla and that he turned them over to Trooper Bivens, of the Pennsylvania State Police. Trooper Bivens testified he was present when the autopsies were performed and that when the bullet slugs were removed, they were turned over to him and that he took them to the Greensburg State Police (Crime) Laboratory.[9] Trooper Daryl Mayfield of the Greensburg State Police (Crime) Laboratory, who was admitted as an expert in ballistics, testified that he received three bullet slugs from Trooper Bivens and after examining each, determined all three to be .32 caliber bullet slugs and further that all three were fired from the same gun. Furthermore a .38 caliber handgun was introduced into evidence, and identified by Ms. Johnson as Brown's.

8. The appellant's trenchcoat was introduced at trial. N.T., Third Trial, p. 575–79.

9. Trooper Bivens had also testified that he removed Brown's finger prints from the cash register of Carl's Cleaners.

Any doubts the jury may have had as to the guilt of the appellant were, if believed, removed by the testimony of the last two Commonwealth witnesses, Brown and Olen Clay Gorby. Brown testified that around 1:00 P.M. on August 17, 1979, he and the appellant left Wheeling, West Virginia, in his car and headed towards Pittsburgh. He testified that on the way they spotted an exit for Cannonsburg and took it so they could "make a couple extra dollars." He testified he had a .38 caliber handgun and the appellant had a .32 caliber handgun and that the appellant was wearing a beige trenchcoat. He then testified that once inside Cannonsburg, they spotted a cleaners and after circling it and seeing only one girl working, they decided to park and go in. He testified that upon entering they asked for a price list and when the girl bent down they pulled out their guns. He stated further that the appellant went into the back to make sure no one else was there. He testified that while he was emptying the cash register he heard a gun shot and when he looked back, he saw an old man holding his stomach and then saw the appellant shoot him in the back, "before he could hit the ground." N.T., Third Trial, p. 613. He said that the appellant then came back, asked him to shot the girl and that he refused. He then testified, referring to the appellant, "at that point he didn't hesitate, he just shot...." N.T., Third Trial, p. 614. He testified they then left the cleaners, Brown first and the appellant following, and that they still had their guns out about half way down the street before they put them away.

Olen Clay Gorby testified that he was incarcerated with the appellant in the Washington County Jail during the summer of 1980 and that at that time, he had known the appellant for approximately seven years. He stated that during a conversation he had with the appellant while both were incarcerated, the appellant admitted that he robbed Carl's Cleaners and that he shot Mr. Luisi.[10] Further,

10. Gorby also stated during the trial that the appellant had been trying to get Gorby to smuggle a gun into the prison so that the appellant could escape and kill Brown and that the appellant said he wanted to kill Brown because "when he killed Brown, he said all the evidence

Gorby testified that the appellant said he told Brown to shoot Ms. Spalla and when Brown refused, he did.

The evidence presented if believed, sufficiently established the appellant's guilt and in fact, left no room for doubt, with the credibilities accepted by the jury, the evidence is overwhelming. With this in mind we address the appellant's specific claims of error.

The first claim of error is the trial court erred in denying his motion for a mistrial based upon a commonwealth witness' testimony which raised an inference of the appellant's past criminal record. At trial the prosecution asked Olen Gorby, "where did you meet the defendant Wallace" and Gorby replied, "I met him in the West Virginia Penitentiary, 1973." N.T., Third Trial, p. 722–23. The defense objected and moved for a mistrial.[11] The appellant's motion was denied and appellant refused an offer by the trial judge to give a cautionary instruction claiming that an instruction would only serve to further prejudice him. N.T., Third Trial, p. 738–749.[12]

Appellant claims that the testimony was highly prejudicial because it created an inference of unrelated past criminal acts and because it was highlighted by an overnight recess directly after introduction. The prosecution argues that it was merely attempting to demonstrate that there was a relationship between the witness and the appellant, to establish that the appellant would confide in the witness. Further the prosecution argues that the statement did not relate to a specific past criminal act and that at the time of the statement, approximately 90% of the commonwealth's evidence had been presented. The trial judge ruled that the creation of the inference was uninten-

would be dead, he wouldn't have to worry about the charges." N.T., Third Trial, p. 759.

11. The appellant never testified.

12. While the appellant asserts in his brief that he took no position as to whether a cautionary instruction should be given, it is clear from the record that they did in fact refuse the trial court's offer. N.T., Third Trial, p. 738–39.

tional on the part of the prosecution and that it did not exploit the statement. N.T., Third Trial, p. 736.

In *Commonwealth v. Morris,* 513 Pa. 169, 519 A.2d 374 (1986), we addressed a similar situation where there was an improper reference to prior criminal activity at trial. In *Morris* we held:

As a general rule, evidence of crimes unrelated to the charge for which the defendant is being tried, is inadmissible. .... There is no per se rule that requires a new trial for a defendant every time there is a reference to prior criminal activity. .... "We have never ascribed to the view that all improper reference to prior criminal activities necessarily require the award of a new trial as the only effective remedy." .... Further the reference to the prior criminal activity must be prejudicial to the defendant, with prejudice resulting "where the testimony conveys to the jury, either expressly or by reasonable implication, the fact of a prior criminal offense."

However it is possible to eradicate any possible prejudice resulting from reference to prior criminal activity by the defendant.... An immediate curative instruction to the jury may alleviate any harm to the defendant that results from reference to prior criminal conduct.

*Id.,* 513 Pa. at 175–76, 519 A.2d at 376–77. (Citations omitted).

This is not a situation involving an exception to the general rule nor is there any doubt that the testimony created an inference to the jury that the appellant had been involved in prior criminal activity. However we do not believe that a new trial is warranted under the circumstances present here. As we said in *Morris,* there is no *per se* rule that requires a new trial for a defendant every time there is a reference to prior criminal activity. In this case, the testimony did not relate to any specific past criminal act and while the testimony might have inferentially exposed a prior conviction, the jury had no direct knowledge of the basis of that conviction. In light of the overwhelming and uncontroverted evidence presented establishing appellant's

guilt, the improper reference to the appellant's prior incarceration was harmless at most.[13]

■ The appellant asserts in the alternative, that the trial judge erred in not giving a cautionary instruction. The record reveals that the trial court offered to give a cautionary instruction and that counsel for the appellant failed to take a stand on whether or not one should be given. Further the record reveals that no objection was made when a cautionary instruction was not forthcoming. This argument has been waived. *See Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987); *Commonwealth ex rel. Washington v. Maroney*, 427 Pa. 599, 644, 235 A.2d 349, 352 (1969).[14]

■ The second claim of trial error is that the trial court improperly excluded a six page signed statement made by Anita Johnson to police.[15] The appellant asserts that the statement was admissible as impeachment evidence against Ms. Johnson or Brown thus, as substantive evidence of the appellant's innocence. In the statement Ms. Johnson alleged that on the Sunday night that Brown returned to her apartment, Brown told her he shot Ms. Spalla. Ms. Johnson's statement was made to police on August 23, 1979, six

13. *See Commonwealth v. Terry*, 513 Pa. 381, 405, 521 A.2d 398, 410 (1987). (Improper admission of evidence which is cumulative of properly admitted evidence and is uncontroverted is not reversible error.); quoting, *Commonwealth v. Story*, 476 Pa. 391, 411, 383 A.2d 155, 166–67 (1978).

14. While the rules of waiver are somewhat relaxed in capital punishment cases, we still apply an ineffective assistance analysis to a situation such as this. *See Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982); *Commonwealth v. Logan*, 519 Pa. 607, 549 A.2d 531 (1988). Appellant's attorney gave a reasonable explanation for declining the court's offer to give a cautionary instruction and thus he cannot be deemed ineffective. *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987).

15. Appellant's second, third, fourth and sixth claims of trial error, relate to the admissibility of evidence. In reviewing these claims we are guided by the rule of law that the admissibility of evidence is a matter addressed to the sound discretion of the trial court, and that an appellate court may reverse only upon a showing that the trial court abused its discretion. *Commonwealth v. Claypool*, 508 Pa. 198, 204, 495 A.2d 176, 178 (1985); *Commonwealth v. Bartlett*, 446 Pa. 392, 400, 288 A.2d 796, 799–800 (1972).

days after the murders and three days after the alleged conversation. The trial judge had excluded the statement under the hearsay rule holding that no inconsistencies existed between Ms. Johnson's trial testimony and the statement she made to police, thus the prior statement was inadmissible as impeachment evidence.

In addition to the summarized testimony referred to above, Ms. Johnson testified that she first heard about the robbery and murders on Monday morning, however when cross-examined about what Brown had told her, she changed her testimony by stating that on the night of August 20, 1979, when Brown returned to her apartment, he was handling his gun in front of her and that he mentioned "something about something." N.T., Third Trial, p. 573–74. The appellant claims that Ms. Johnson's trial testimony is inconsistent with the statement she made to police and the statement was admissible as impeachment evidence. We need not address the underlying issue of whether Ms. Johnson's statement was admissible for we find that its exclusion was harmless error at best.

Johnson's testimony was a recitation of what she knew of her own knowledge and observation. What she offered was circumstantial evidence. Her testimony was not a direct inculpation of the appellant. In reviewing the evidence it is necessary to keep in mind that at this trial the only defendant was this appellant. What Brown told Johnson was therefore hearsay evidence as against this appellant and therefore not admissible by whoever would offer it. Certainly what Brown told her could not be used to inculpate the appellant and nothing that Brown told her was told to the jury. Were the statement allowed it not only would have inculpated Wallace and Brown in this murder and robbery but was fraught with other crimes that would not be admissible against the appellant. Hence her testimony was carefully restricted circumstantial evidence, and not the direct inculpation contained in Brown's alleged statement to her. The statement takes a different turn, however, where the uses are to impeach the testimony of Brown. Brown

did directly inculpate himself and Wallace at trial. He said Wallace shot both victims. He of course could be asked if he said something different before and he was. In answer he said both yes and no, finally denying that he ever said to Johnson that he shot the girl.

When asked on direct examination whether he told Johnson he shot the girl Brown said, "I may have but I don't remember saying it." N.T., Third Trial, p. 621. On cross examination he both admitted and denied that he told Johnson he shot the girl. The appellant's attorney asked Brown, "You told [her] that you shot the little girl?" and he replied:

Yes. No, wait a minute, I did say something to her to that effect, but I didn't—I don't remember exactly whether I did or not.

N.T., Third Trial, p. 703. In addition, Brown was questioned by appellant's attorney about Ms. Johnson's running around bragging about how he shot Ms. Spalla and Wallace shot Mr. Luisi, but Brown still maintained that it was Wallace who committed the murders. See N.T., Third Trial, p. 705-06. Thus the issue before the jury was his credibility, in view of his earlier admission and later denial both affirming that he told Johnson he did, and denying it.

The third claim of error is that the bullet slugs removed from the victims were improperly admitted because there was a question of their authenticity and there was no testimony as to the chain of custody. He alleges that this was prejudicial because there was a question as to whether one of the victims, Tina Spalla, died as the result of a .38 or .32 caliber bullet wound. However the record reveals that after a proper foundation had been established, Trooper Mayfield of the Greensburg State Police (Crime) Laboratory testified that all three bullet slugs removed from the victims were fired from the same .32 caliber handgun. Therefore the admission of the bullets was not error. The bullet slugs had been in the custody of the court since the first trial in 1981 when a proper foundation had been laid. Thus their custody was authenticated.

312

 The fourth claim of error is that the trial court erred in allowing the testimony of Brown. The appellant asserts that Brown's testimony was coerced by the prosecution, thus his right to due process, under the fifth and fourteenth amendments to the United States Constitution, were violated. Specifically he claims that Brown's testimony was obtained in violation of Rules 321, 1410 and, 1501 thru 1507, of the Pennsylvania Rules of Criminal Procedure, which govern guilty pleas, sentencing and post-conviction relief under the Post Conviction Hearing Act (P.C.H.A.).[16] The appellant does not allege that the witness lied. The record reveals that every aspect of the bargain between Brown and the prosecution was presented to the jury in painstaking detail and that nothing was hidden from their scrutiny. Thus the admission of Brown's testimony was harmless. Further the appellant lacks standing to challenge the guilty plea or plea bargain. *See Commonwealth v. Howard*, 358 Pa.Super. 259, 517 A.2d 192 (1986).

 The fifth claim of error is that the trial judge erred in refusing appellant's request for a non-jury trial. The appellant asserts that he had an absolute right to a non-jury trial regardless of motivation. We disagree. The appellant has the constitutional right of trial by jury and he has a legal right to waive a jury trial and have the case decided by a judge. *Commonwealth v. Wharton*, 495 Pa. 581, 435 A.2d 158 (1981); *Commonwealth v. Sorrell*, 500 Pa. 355, 456 A.2d 1326 (1982); *Adams v. United States ex rel. McCann*, 317 U.S. 269, 278–280, 63 S.Ct. 236, 241–242, 87 L.Ed. 268 (1942). In addition, the decision is that of the defendant and not his attorney. *See Commonwealth v. Brown*, 329 Pa.Super. 85, 477 A.2d 1364, 1368 (1984). However the right is not absolute and it does not include the right to judge-shop. *Commonwealth v. Garrison*, 242 Pa. Super. 509, 514–15, 364 A.2d 388, 390–91 (1976) (jury trial waiver properly denied where record indicates "judge shop-

16. Brown's attorney allegedly filed a P.C.H.A. petition alleging his own ineffective assistance and represented him through the hearing to withdraw his plea which allowed Brown to plead anew and receive a reduced sentence, in return for his trial testimony.

ping"); *Sorrell,* 500 Pa. at 362, 456 A.2d at 1329 (Having determined that exposure to the accused's criminal record would potentially taint court's impartiality as a fact finder, the court properly denied request for non-jury trial); *Municipal Publications, Inc. v. Court of Common Pleas of Philadelphia County,* 507 Pa. 194, 202, 489 A.2d 1286, 1289 (1985) (Judge shopping has been universally condemned and will not be tolerated). The trial judge denied the appellant's motion finding that the appellant was merely attempting to have the judge recuse himself and that he was not truly waiving his right to trial by jury. These findings are supported by the record and the trial judge properly denied appellant's motion.[17]

The sixth claim of error is that the trial judge erred in denying appellant's request to call two witnesses to testify on his behalf, specifically Jon Stevens and the trial judge himself. The appellant sought to introduce Stevens' testimony to bolster another witness' trial testimony. The trial judge ruled the testimony was irrelevant because the other witness' credibility was never challenged.[18] The trial judge's ruling is supported by the record. Therefore we find no abuse of discretion.

The trial judge also held that his testimony was irrelevant. The appellant asserts that the judge's testimony

---

**17.** The trial judge found that the appellant was not waiving his right to a jury trial but merely attempting to indirectly force the judge to recuse himself. This trial judge had presided over the defendant's two previous trials. Furthermore the appellant complained that he did not feel that the trial judge would conduct an impartial trial because of the trial judge's prior involvement. *See* Transcript of Request for Non–Jury Trial, October 1, 1985, p. 28. Thus the trial judge properly denied the request.

**18.** Appellant also contends that the trial court's ruling was contradictory with an earlier ruling which allowed a prosecution witness to testify. Specifically the trial court allowed testimony from Trooper Bivens about finding Brown's finger print on the cash register. While we agree that this testimony corroborated Brown's testimony, it also served to establish the charge of conspiracy but more importantly the judge's ruling was not contradictory since the credibility of Brown was challenged by the appellant. Furthermore Trooper Bivens' testimony was necessary to lay the foundation for Trooper Mayfield's testimony.

was relevant to show that the prior guilty plea of Brown was valid and thereby attack the credibility of Brown. The trial judge denied the motion because the arrangement between the prosecution and Brown had already been fully explained to the jury. This ruling is supported by the record and we find no abuse of discretion.[19]

The seventh claim of error is that the trial judge misled the the jury in closing remarks by highlighting the defense witnesses' past criminal records and by failing to give the same attention to prosecution witnesses, thus prejudicing him and denying him a fair trial. Appellant concedes that the jury was aware of the witnesses' criminal records but argues that the judge's bias in his remarks served to prejudice his case. The trial judge emphasized the convictions of the defense witnesses as the appellant complains. N.T., Third Trial, p. 952. However the record reflects that the trial judge properly charged the jury on the unreliability of Brown's testimony and in fact went further than necessary by stating that the jury should view Brown's testimony as coming from a corrupt and polluted source and that they should accept it only with care and caution. N.T., Third Trial, pp. 952–953. In addition the record does not reflect nor does the appellant assert, that he requested any special charge with regard to this issue.

The eighth claim of error is that evidence was insufficient and thus the trial court erred in denying his demurrer to the evidence. In support of this claim the appellant asserts

**19.** In the opinion of the Court of Common Pleas, which denied the appellant's post trial motions, the court states that the appellant requested that the trial judge testify nine days into the trial. However the record reflects that the appellant originally informed the trial judge of his intent to call the judge on the eve of trial after the jury was picked but before the jury was sworn.

In his pretrial request the appellant refused to disclose the reason for his request except to state that it was necessary since the judge had presided over the 1980 proceeding in which Brown had pled guilty. The trial judge denied appellant's pretrial request holding that the defendant was merely making another attempt to have the judge recuse himself and that if the appellant needed to establish a relevant point relating to that proceeding, it could be done through the transcripts of that proceeding. This ruling was proper in light of the defendant's prior attempt to "judge shop."

that the only direct evidence of guilt was Brown's testimony and that it should not have been admitted and that the other evidence was insufficient to sustain his conviction. We have previously addressed the appellant's claim that Brown's testimony was improperly admitted and concluded it to be without merit. Furthermore we have addressed whether the evidence was sufficient and have found that it was.

In addition to the above, neither of the issues raised by the appellant's assertion of trial error, are appealable. The trial court's denial of appellant's demurrer to the evidence is not appealable since he presented a case in defense. *See Commonwealth v. Sourbeer,* 492 Pa. 17, 422 A.2d 116 (1980); *Commonwealth v. Ilgenfritz,* 466 Pa. 345, 353 A.2d 387 (1976). A challenge to the weight of the evidence is not appealable. *See Commonwealth v. Nelson,* 514 Pa. 262, 271, n. 3, 523 A.2d 728, 733, n. 3 (1987). Moreover, circumstantial evidence is sufficient to sustain a conviction "so long as the combination of evidence links the accused to the crime beyond a reasonable doubt." *Commonwealth v. Hardcastle,* 519 Pa. 236, 246, 546 A.2d 1101, 1105 (1988) (citations omitted); *Commonwealth v. Holcomb,* 508 Pa. 425, 447, 498 A.2d 833, 844 (1985) (... the cumulative effect of all the circumstantial evidence together with the reasonable inferences and conclusions logically flowing from that evidence is enough to support the guilty verdict.). Regardless of the admission of Brown's testimony we believe that the other evidence presented at trial sufficiently linked the appellant to the robbery and murders, beyond a reasonable doubt. A death sentence can be imposed in cases where a conviction for murder of the first degree rests upon circumstantial evidence. *See Commonwealth v. Yarris,* 519 Pa. 571, 603–604, 549 A.2d 513, 529 (1988); 42 Pa.C.S., § 9711(e).

Lastly, in all cases in which the death penalty has been imposed, we are obligated by statute to review the record and to assure that the death sentence: is not the product of passion, prejudice or any other arbitrary

factor;[20] is supported by a finding of aggravating circumstances specified in subsection (d);[21] and is not excessive or disproportionate to the penalty imposed in similar cases....[22] Further pursuant to *Commonwealth v. Frey*, 504 Pa. 428, 443, 475 A.2d 700, 707–08 (1984), *cert. denied* 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984), we are obligated to review data and information pertaining to similar cases, compiled by the Administrative Office of the Pennsylvania Courts (AOPC).

The jury had found one aggravating circumstance and no mitigating circumstances. Specifically the jury found that the appellant murdered Ms. Spalla while committing a felony. This is supported by the record and is within the statute. 42 Pa.C.S., § 9711(d)(6). Further the appellant refused to present any evidence of mitigation. N.T., Third Trial, p. 993. Under these circumstances, the statute requires a sentence of death, thus the sentence cannot be considered excessive or the product of passion. 42 Pa.C.S., § 9711(c)(1)(iv); *Commonwealth v. Blystone*, 519 Pa. 450, 474, 549 A.2d 81, 93 (1988). Furthermore we have reviewed an AOPC study and the appellant's sentence is not disproportionate to the sentence imposed on others similarly situated.

Based upon the forgoing reasons, we sustain the convictions and affirm the sentences.

ZAPPALA, J., files a dissenting opinion in which NIX, C.J., joins.

STOUT, Former Justice, did not participate in the decision of this case.

ZAPPALA, Justice, dissenting.

I dissent because I believe that the Appellant's argument that the trial court erred in permitting Henry Brown to testify as a witness has merit. This allegation of error,

**20.** 42 Pa.C.S.A., § 9711(h)(3)(i).
**21.** 42 Pa.C.S.A., § 9711(h)(3)(ii).
**22.** 42 Pa.C.S.A., § 9711(h)(3)(iii).

which is based upon the prosecutor's conduct in securing the witness' testimony, requires a lengthy examination of the events which precipitated Brown's appearance at trial.

The Appellant was with Henry Brown on the day he was arrested. Brown fled from the police, however, and successfully eluded them until he was arrested in another state. On January 23, 1980, he gave a statement to law enforcement officers identifying the Appellant as the one who shot the victim.

Brown entered a guilty plea to two counts of murder in the second degree and to robbery as a result of this incident on October 24, 1980. At the time he entered his plea, Brown was represented by privately retained counsel, Paul Gettleman, Esquire. The plea was accepted by Judge Bell, who sentenced Brown to two concurrent life sentences.

The guilty plea entered by Brown on October 24, 1980 was not the first plea offered. The first guilty plea offered by Brown was made in January, 1980, at a time when he was represented by counsel other than Paul Gettleman. During cross-examination, Appellant's counsel questioned Brown extensively about the *first* plea and read the following excerpted portions from the transcript of the first plea proceeding before Judge Bell:

Q. I am going to read to you from the transcript of your first guilty plea, Mr. Brown, and I want you to tell me whether or not this is correct. The Judge is examining you and that Judge is the same Judge that is sitting next to you here, Judge Bell, and he says to you, he says, with respect to your plea bargain, he says, *"And you also, if required of you, will testify against Tippy Wallace [William Wallace], is that correct?" Answer—"yes." Question—"And that is part of the plea bargain, I assume." Answer—"Yes."* Question—"Now is there anything you would like to tell me concerning this offense or these offenses?" Answer—"What I don't understand is this going to be all—is this all going to be verbal or is this between the prosecutor and myself?" Question

318

—"The question was, he wants to understand, is this all verbal or do you want something in writing here. It is verbal here, but as you can see, the Court Stenographer is taking this down word for word, and that will all be transcribed, and believe me, I have it written down here what it is, and it is transcribed there under oath of you. And as I say, if I go along with this plea bargain, that is what it will be; if I don't go along with the plea bargain, then you are right back where you started from. Do you understand? Likewise, however, if you don't go along with anything here, we are right back where we started from. Do you understand?" Answer— "Yes." Question—"Is there any other question you have?" Answer—"No." Question—"Now if I accept the plea bargain, I will go into further detail about your appellate rights and also you and your counsel will be given the opportunity at the time of sentencing to say anything. Do you understand that?" Answer—"Yeah." Now, Mr. Brown, were you confused at that time, you didn't understand what was going on?

A. At that time, no.

Q. At that time you weren't confused. Now you withdrew that plea bargain, didn't you?

A. Yes.

Q. And you withdrew that plea bargain in July of 1980, correct?

A. Yes, on advice of my lawyer, yes.

(N.T. pp. 656–658) (Emphasis added).

The first plea was withdrawn on July 16, 1980. Brown's testimony suggested at first that his reason for withdrawal of that plea was that he felt he should not have to serve a sentence of life imprisonment because of his limited involvement in the murders and was due also to poor advice from his first counsel. But the excerpted portions of the transcript of the withdrawal of the guilty plea read into the record by Appellant's counsel on cross-examination reveal

that the Commonwealth would not proceed with the plea bargain because Brown's first attorney had advised the Commonwealth that Brown would not testify against the Appellant. (N.T. pp. 663–664). Due to Brown's refusal to testify, the district attorney withdrew the Commonwealth's agreement to plea bargain. The district attorney then indicated that he would proceed with the criminal informations and seek the death penalty on the charge of first degree murder.

Five years elapsed between the date on which Brown entered his guilty plea to the date on which the third trial of the Appellant commenced. On the eve of Appellant's trial, however, Brown was permitted to withdraw his guilty plea and entered into yet another plea bargain with the Commonwealth. In exchange for his testimony against the Appellant, Brown was allowed to withdraw his guilty plea to second degree murder and enter a plea to third degree murder.

The Appellant asserts that the prosecutor's conduct in obtaining Brown's testimony at trial was improper, necessitating the grant of a new trial. I would agree.

The withdrawal of Brown's guilty plea was permitted upon presentation of a petition alleging the ineffectiveness of counsel Paul Gettleman during his representation of Brown at the time the plea was entered. The petition was presented by Paul Gettleman himself, alleging his own ineffectiveness. The petition, ostensibly filed under the Post–Conviction Hearing Act (PCHA), 42 Pa.C.S. §§ 9541–9551, was unopposed by the prosecuting attorney, who eagerly conceded that Brown should be permitted to withdraw his guilty plea for the reasons cited in the petition.

Although the transcript of the PCHA proceedings was not incorporated into the record at this trial, discussions held in chambers with counsel revealed that the proceeding was not the ordinary one of an adversarial nature between the Commonwealth and the defendant. Atypically, the proceeding consisted of representations by counsel Paul Gettleman that he had been ineffective in advising Brown during

the guilty plea proceedings five years earlier, that his ineffectiveness would merit a new trial, and that if Brown would be permitted to withdraw his guilty plea, the new plea arrangement contemplated by the Commonwealth would be recommended to Brown. Because the Commonwealth agreed that Brown's request for withdrawal of the guilty plea through the vehicle of the PCHA petition would not be opposed if Brown would testify against Wallace, no hearing was held on the merits of the petition itself. Instead, a written stipulation and agreement was entered into on behalf of Brown and the Commonwealth permitting the plea to be withdrawn.

The filing of the PCHA petition was no more than a guise for the striking of a plea bargain which had fallen by the wayside five years earlier, due to Brown's failure to co-operate with the Commonwealth. Apparently, Brown's incarceration had given him ample opportunity to reflect on the wisdom of protecting the Appellant. Persuaded by a burgeoning sense of injustice, Brown recognized that his testimony against the Appellant in the third trial would enable him to salvage the bargain offered to him earlier. The prosecutor seized the moment as well.

From the outset of the trial, defense counsel objected to the introduction of Brown's testimony because of the unusual procedure employed to obtain it. Although defense counsel was aware that Paul Gettleman and the prosecuting attorney had appeared before Washington County Court of Common Pleas President Judge Thomas Gladden to present the so-called PCHA petition, it was not until the middle of the Appellant's trial that defense counsel was even given access to a copy of the petition.[1] On October 25, 1985, the petition had been presented and ruled upon, but it was still not a matter of public record.

---

1. The PCHA petition was not presented to Judge Bell apparently due to the fact that defense counsel for the Appellant had indicated prior to trial that the Appellant wished to call Judge Bell as a witness regarding the earlier guilty plea entered by Brown and would file a request for recusal of Judge Bell for that reason. Judge Bell did not testify and determined that recusal was unnecessary. The district attorney advised Judge Bell of his intention to present the petition to President Judge Gladden.

Prior to Brown's testimony, defense counsel indicated once again that the PCHA petition had not been docketed, despite President Judge Gladden's acceptance of the petition and plea bargain. No copy of the plea agreement had yet been provided to defense counsel, despite repeated requests. The prosecuting attorney admitted to having possession of the original petition and four copies at that time, but disingenuously stated that he had felt no obligation to file or not file the documents. The trial judge had to instruct the prosecuting attorney to provide defense counsel with a copy of the documents.

The terms of the plea bargain were set forth in the record by defense counsel on cross-examination of Brown:

Q. Mr. Brown, this is the document that you signed and it is known as Plea Agreement, is that correct?

A. Yes.

Q. This is in the case of Commonwealth of Pennsylvania versus Henry Eugene Brown, is that correct?

A. Yes.

Q. Paragraph one, it says, "In return for his testimony against William Wallace, his co-defendant charged with two counts of criminal homicide, robbery and criminal conspiracy, the Commonwealth agrees to the following: the Commonwealth agrees not to contest the Post–Conviction Hearing Act filed by Henry Eugene Brown, wherein he requests to withdraw his guilty plea."

Q. You haven't filed that yet, have you, Mr. Brown?

A. Not that I know of. This is it, yes.

Q. So that when this agreement says it's been filed, that is not correct, is it? It hasn't been filed, to the best of your knowledge.

A. To the best of my knowledge, no.

Q. "The Commonwealth concedes that Henry Eugene Brown should be permitted to withdraw his guilty plea to first degree murder [sic] for the reasons cited

322

in the PCHA Petition." C—"The Commonwealth would recommend to the Court that because of Henry Brown's cooperation with the authorities in the investigation of this case and because his testimony is critical in the prosecution of William Wallace, that a plea should be offered and accepted to murder of the third degree, with a total maximum sentence on all charged not to exceed ten to twenty years."

Q. Is that correct?

A. Yes, that's what it reads.

Q. "The Commonwealth agrees that Henry Brown is entitled to credit towards this sentence for any time that he has already served for this crime and in addition, the Commonwealth agrees and promises that Henry Brown will be incarcerated in another state penal system outside of Pennsylvania for the duration of his term. The Commonwealth will recommend to the State of Ohio that any and all detainers lodged against Henry Eugene Brown should be dismissed, based upon his cooperation in this prosecution and based upon the fact that the detainers were lodged over six years ago and have not been acted on as of this date."

Q. Correct?

A. Yes.

Q. Paragraph two, "In order to fulfill his part of the agreement, Henry Eugene Brown agrees to testify truthfully and completely to all facts surrounding the case at issue. Said testimony, however, to be substantially consistent with the statement of said Henry Eugene Brown as given to law-enforcement officers on January 23, 1980, wherein he identifies William Wallace as the shooter of Tina Spalla and Carl Luisi, Sr." Paragraph three, "If William Wallace is convicted at a later date and would receive a new trial in this matter, Henry Eugene Brown agrees to return to Washington County, Pa. if subpoenaed and offer the same testimony on behalf of the Common-

wealth." Paragraph four, "This plea is in no way conditioned upon a finding of guilty of William Wallace. The only condition that Henry Eugene Brown must fulfill for the terms of this plea bargain to take effect is to give complete and truthful testimony regarding William Wallace and the facts surrounding a double homicide at Carl's Cleaners in the Borough of Canonsburg on August 17, 1979 in Washington County, Pa. In order to fulfill his part of the agreement, Henry Eugene Brown agrees to testify truthfully and completely to all facts surrounding the cases at issue. Said testimony, however, to be substantially consistent with the statement of the said Henry Eugene Brown as given to law-enforcement officers on January 23, 1980, wherein he identifies William Wallace as the shooter of Tina Spalla and Carl Luisi, Sr." "Five, once Henry Eugene Brown testified on behalf of the prosecution, he will be taken immediately back to the presiding Judge for an imposition of sentence consistent with the terms of this agreement, but under no circumstances will the total terms of confinement exceed ten to twenty years, to be served in a penal institution outside of Pennsylvania. Upon receipt of a copy of an application for parole on behalf of Henry Eugene Brown, an investigation shall be conducted into prison behavior of the said Henry Eugene Brown. In the event said investigation reveals Brown to having been a satisfactory prisoner, the District Attorney of Washington County will recommend the granting of the Application for Parole."

Q. That is the sum and substance of the whole agreement, isn't it?

A. Yes.

(N.T. pp. 684–688).

Although the Appellant lacks standing to challenge the validity of the guilty plea entered by Brown, that does not foreclose him from challenging the admissibility of Brown's testimony because of prosecutorial misconduct. In that

respect, the Appellant's position is critically different from the factual circumstances in the case of *Commonwealth v. Howard*, 358 Pa.Super. 259, 517 A.2d 192 (1986), which was relied upon by the trial court in denying the Appellant's post-trial motions.

In *Commonwealth v. Howard*, the appellant had argued that the trial court erred in denying a motion to vacate the plea entered by a contract killer hired by the appellant to kill his wife and to exclude the killer's testimony at trial. In exchange for his truthful testimony against the appellant, the Commonwealth had agreed not to seek the death penalty against the hired killer. The Superior Court held that the appellant had no standing to challenge the guilty plea or plea bargain, and that the witness' testimony could not be excluded without a showing that the appellant's constitutional rights had been violated.

This is not a situation, however, in which the prosecutor has simply used his discretion to entertain a plea bargain in exchange for a witness' co-operation in testifying against another. The prosecutor in this case engaged in the deliberate manipulation of the judicial process to secure testimony from a witness in exchange for a plea bargain long past the time when plea negotiations were properly within his discretion. The PCHA proceeding was a subterfuge intended to regain an advantage lost when Brown would not comply with the conditions contemplated in the original offer of a plea bargain. Shared regrets by the prosecutor and witness do not justify such action. It was admitted that the district attorney's office had even approached the State Pardons Board to find a way to negotiate a plea bargain with Brown. The patent misuse of the PCHA procedure by the prosecutor to ensure Brown's testimony was misconduct which renders the testimony inadmissible and would require a new trial.

The majority cavalierly dismisses the Appellant's argument by concluding that the plea bargain was presented to the jury. This reasoning misses the point. Yes, the jury was told of the plea bargain—but it is the Commonwealth's patent abuse of the legal process in obtaining the testimony

that bars its use. The right to be protected is the defendant's right to a fair trial. It is not enough then to say simply that the jury knew what was promised to Brown in exchange for his testimony.

When the Commonwealth undertakes prosecution of a defendant and secures a successful prosecution by manipulating the judicial system, the right to a fair trial is destroyed. It cannot be salvaged by showing what motive the *witness* has to testify because it is the *Commonwealth's* conduct that has deprived the defendant of that right. That conduct is not, and should not be, before the jury—it is for this Court to redress that wrong.

I would reverse the judgments of sentence and grant a new trial.

NIX, C.J., joins in this dissenting opinion.