**William WALLACE, Jr., Petitioner,**

v.

**James PRICE, Superintendent of the State Correctional Institution at Greene, et al., Respondents.**

**Civil Action No. 99–231.**

United States District Court, W.D. Pennsylvania.

March 31, 2003.

---

Michael J. Fagella, Office of the District Attorney, Washington, PA, for Respondent.

Matthew Lawry, Michael Wiseman, Defender Association of Philadelphia, Philadelphia, PA, Joel B. Johnston, Pittsburgh, PA, for Petitioner.

## OPINION AND ORDER

McLAUGHLIN, District Judge.

### INTRODUCTION

This is a capital case brought under 28 U.S.C. § 2254, and it is before the Court on objections filed by Petitioner William Wallace, Jr. and Respondents, dkt. nos. 39 and 40, respectively, to the Report and Recommendation ("R & R") of Chief Magistrate Judge Francis X. Caiazza, dkt. no. 35, *Wallace v. Price*, 2002 WL 31180963 (W.D.Pa. Oct.1, 2002). In the R & R, Magistrate Judge Caiazza recommends granting Wallace habeas relief from his conviction of first-degree murder and his resulting sentence of death. He further recommends denying Wallace relief with respect to his convictions for second-degree murder, for which he is serving a life sentence, robbery, and criminal conspiracy.

Where, as here, objections have been filed, the Court is required to make a *de novo* determination as to those portions of the R & R to which objections were made. *See* 28 U.S.C. § 636(b)(1). Accordingly, the Court has carefully examined *de novo* all claims raised by Wallace and Respondents to each of their respective objections. In addition, the Court conducted a hearing on the objections to the R & R on March 4, 2003, in which Matthew Lawry, Esquire, of the Defender Association of Philadelphia, appeared on behalf of Wallace, and Michael J. Fagella, Esquire, Assistant District Attorney of Washington

County, appeared on behalf of the Respondents.[1] Also, in ruling on Wallace's and Respondents' objections, the Court has carefully reviewed all aspects of the R & R and finds it to be thorough and well reasoned. In almost all respects, it requires no amplification or elucidation.

The Court writes now only to address limited, specific issues raised in each of the party's objections, namely:

(1) Respondents' objection to the Magistrate Judge's recommendation that Wallace's first-degree murder conviction should be vacated because the trial court refused to admit, either as substantive evidence or for impeachment purposes, Henry Brown's statement that he, and not Wallace, shot Tina Spalla; and,

(2) Wallace's objections to the Magistrate Judge's recommendation that the Court deny him federal habeas corpus relief on his claims that:

(i) his convictions for second-degree murder, robbery, and conspiracy should be vacated because the trial court refused to admit, either as substantive evidence or for impeachment purposes, Brown's statement that he shot Spalla;

(ii) the Commonwealth engaged in prosecutorial misconduct when it intentionally manipulated the judicial process in order to secure the testimony of Brown;

(iii) he received ineffective assistance of counsel because his trial counsel failed to obtain an independent ballistics test;

(iv) his Sixth Amendment right to counsel was violated when the Commonwealth employed Olen Clay Gorby as an agent to deliberately elicit incriminating statements from him; and,

(v) his Eighth and Fourteenth Amendment rights were violated when the trial court provided ambiguous sentencing-stage instructions suggesting that the jury's determination with respect to mitigating factors had to be unanimous.

While Wallace has raised several other objections to the Magistrate Judge's recommendations, the Court has determined that only the above-cited claims require further discussion beyond that which is set forth in the R & R.

As discussed more fully below, the Court will overrule Wallace's and the Respondents' objections and approve and adopt Chief Magistrate Judge Caiazza's R & R in full, as supplemented herein.

### BRIEF FACTUAL HISTORY

The Magistrate Judge explains the factual history of Wallace's case in full, and the Court will only briefly summarize it here for context.

Shortly after 5:00 p.m. on August 17, 1979, two men entered Carl's Cleaners in Canonsburg, Pennsylvania. (Third Trial Tr. at 612). Several minutes later, Carl Luisi Sr., the owner of Carl's Cleaners, was found dead, having been shot twice, once in the abdomen and once in the back. (*Id.* at 268–70, 352–53). Tina Spalla, a fifteen-year-old employee, had also been shot. (*Id.* at 273). Despite emergency personnel's attempts to revive her, Spalla died shortly before 6:00 p.m. (*Id.* at 324, 329–30, 353–54, 490).

Wallace was arrested on August 20, 1979 and charged with first-degree murder for the deaths of Spalla and Luisi, robbery,

---

**1.** Throughout this Opinion, the Court will refer to the transcript of the March 4, 2003 hearing as follows: (Hearing Tr. at ——).

and criminal conspiracy. Brown was apprehended shortly thereafter. In January 1980, Brown pled guilty to two counts of felony-murder (second-degree murder), one count of robbery, and one count of criminal conspiracy for his participation in the robbery of Carl's Cleaners and the murders of Luisi and Spalla. (*Id.* at 653). He was sentenced to life in prison. (*Id.* at 661).

Wallace's first trial commenced on December 3, 1980. *Commonwealth v. Wallace,* 500 Pa. 270, 455 A.2d 1187, 1188 (1983) ("*Wallace I* "). This first trial ended in a mistrial because the jury was unable to reach a verdict. *Id.* A second trial commenced on February 2, 1981, and, this time, Wallace was convicted of first-degree murder for the death of Spalla, second-degree murder for the death of Luisi, robbery, and criminal conspiracy. *Id.* On the first-degree murder conviction, the jury sentenced Wallace to death. *Id.* at 1188–89. This verdict, however, did not withstand appeal. The Supreme Court of Pennsylvania vacated Wallace's convictions and remanded for a new trial. *Id.* at 1193. In particular, the Court found that the Commonwealth had knowingly elicited "false" testimony from its star witness, Olen Clay Gorby, *id.* at 1191, and that it had concealed evidence about Gorby's past criminal record and identity. *Id.* at 1191–93.

On October 21, 1985, Wallace's third jury trial commenced. *Commonwealth v. Wallace,* 522 Pa. 297, 561 A.2d 719, 729 (1989) ("*Wallace II* "). At this trial, Brown, who had not testified at the first two trials, testified against Wallace. At the conclusion of this trial, Wallace was convicted of all charges against him.[3] The same jury sentenced him to death on his conviction for first-degree murder. *Id.* at 1017. Wallace appealed his conviction and sentence to the Pennsylvania Supreme Court. On July 5, 1989, that Court affirmed his conviction and upheld his death sentence in a five to two vote. *Wallace II,* 561 A.2d at 729.

Wallace subsequently filed various pleadings with the Court of Common Pleas and the Supreme Court of Pennsylvania under the Pennsylvania Post Conviction Relief Act ("PCRA"), 42 Pa. Cons.Stat. Ann. §§ 9541 *et seq.* In 1999, the Supreme Court of Pennsylvania affirmed Wallace's convictions and sentences. *Commonwealth v. Wallace,* 555 Pa. 397, 724 A.2d 916, 925 (1999) ("*Wallace III* "). Soon thereafter, Wallace filed a petition for habeas corpus relief with this Court under 28 U.S.C. § 2254, dkt. no. 5, and an amended petition. Dkt. no. 12.

### GUILT–PHASE CLAIMS

**A. Trial Court's Refusal to Admit Brown's Statement That He "Shot the Girl."**

Wallace claims that his convictions should be vacated because the trial court refused to admit, either as substantive evidence or for impeachment purposes, Henry Brown's statement that he, and not Wallace, shot Tina Spalla.[4] For the reasons set forth more fully below, we concur with the Magistrate Judge that the error here was of federal constitutional dimension. None of the arguments raised by

---

**3.** This included a charge for first-degree murder in the death of Spalla, second-degree murder in the death of Luisi, robbery, and criminal conspiracy. Wallace's third jury was not instructed on first-degree murder for the death of Luisi because the jury at the

second trial had acquitted Wallace of this charge. *Wallace I,* 455 A.2d at 1188.

**4.** This is Claim I in Wallace's Amended Petition, dkt. no. 12, Claim I, at 17.

the Respondents in their objections to the R & R alter our conclusion on this point.

### (1) Factual Background

At trial, Wallace endeavored to show the jury that Brown confessed to the murder of Tina Spalla a few days after the crime to his then girlfriend, Anita Johnson. On August 23, 1979, just five days after the murders, Johnson gave a signed statement to the police in which she stated:

> I asked Henry what happened. He told me that they went to a cleaners and that when they walked in, they had their guns. Tippy[5] had told the man and the girl if they would be cool, nobody would get hurt. First of all, Henry called Tippy "trigger happy" because Tippy had shot the man and then, as the man was falling he shot him again. He told me the man was shot in the front and in the back. He said that the people at the cleaners must have had a good day. The man acted like he didn't want to give up the money. I guess Tippy was scared to go in the back. Henry said something about the money box being in the back. Henry told me he didn't want to touch the cash register because there would be fingerprints and he snatched the money out of the girl's hand and as he was leaving *he shot the girl.*

(Statement of Anita Louise Johnson (quoted in dkt. no. 20, at 24–25)) (emphasis added).

The Magistrate Judge recounts in full detail the circumstances surrounding the admission of Brown's statement that he "shot the girl," and the Court will only briefly summarize them here for context.

Wallace's counsel attempted to place Brown's statement that "he shot the girl" in evidence on three different occasions. First, during cross examination, Wallace's counsel attempted to question Johnson about Brown's statement. (*See* Third Trial Tr. at 559–63). He asked Johnson: "Did Henry also tell you that he shot the girl?" (*Id.* at 561). Before she could answer, the Commonwealth objected. At side bar, the trial court reminded defense counsel that it had previously held that Brown's statements to Johnson were inadmissible hearsay,[6] and sustained the Commonwealth's objection (*Id.* at 561–65)

Next, during Brown's cross examination, Wallace's counsel attempted to garner an admission from Brown that he had, in fact, confessed to Johnson that he shot the Spalla. The record reveals that Brown's responses were both equivocal and contradictory. At first, Brown hedged, admitting that he may have made the statement, but later he explained that he did not remember making the statement. (Third Trial Tr. at 621) ("I may have, but I don't remember saying anything to her about that no." *Id.*); ("I may have. We'd been tired and we were driving most of the day, so I was pretty out of it, so I may have said something. I don't remember." *Id.* at 703); ("I don't remember exactly whether I [said that] or not." *Id.* at 705); ("I don't remember that, no."). Then, when pressed on cross examination, Brown flatly denied ever making the statement. (*Id.* at

---

5. Wallace's nickname was "Tippy."

6. The Magistrate Judge notes that this ruling was arguably incorrect as a matter of state law. At the time, Pennsylvania recognized an exception to the hearsay rule for declarations against penal interest in circumstances where there is considerable assurance of the reliability of the statement. *Commonwealth v. Brace-*

*ro,* 515 Pa. 355, 528 A.2d 936, 940 (1987); *see also Commonwealth v. Yarris,* 557 Pa. 12, 731 A.2d 581 (1999). As set forth below and in the R & R, there existed sufficient indicia of reliability to compel the admission of this statement, whether as a matter of state or federal law.

704) ("Q. You didn't say that? A. No, I didn't." *Id.* at 706) ("Q. And [Johnson] was bragging because you told her that [you shot the girl], didn't you? A. No." *Id.*)

Unable to obtain a clear admission from Brown, defense counsel attempted to recall Johnson during Wallace's case in chief in order to impeach Brown's testimony with his statement to her that he "shot the girl." (*Id.* at 869). The trial court denied him the opportunity, holding that because, in its estimation, Brown never denied confessing to the crime, "there [was] nothing to impeach." .(*Id.* at 878.) In other words, according to the trial court, Brown's statements were simply not inconsistent. (*Id.* at 870–73, 878).

■ As the Magistrate Judge explains, however, the trial court's interpretation of state law was incorrect. Under Pennsylvania law, "[i]t does not matter whether the witness. denies making the inconsistent statement, or *whether he says that he does not recall it.* In either event, an adverse party has the right to introduce extrinsic evidence that the witness did, indeed, make the inconsistent statement." *Commonwealth v. Brown,* 302 Pa.Super. 391, 448 A.2d 1097, 1103–04 (1982) (emphasis added). When it issued its ruling, the trial court ignored Brown's direct denials and focused instead on his poor memory. (Third Trial Tr. at 870–73, 878). Nonetheless, even under the trial court's selective reading of Brown's testimony, the prior statement was admissible. *Brown,* 448 A.2d at 1103–04.

In the end, the trial court's evidentiary rulings prevented Wallace from exploring the circumstances of Brown's alleged prior oral confession. The rulings prevented him from eliciting testimony from Johnson that was critical to his defense. His claim that he did not shoot Spalla was undermined and he was deprived of a powerful means of damaging Brown's credibility. While the trial court's decision that Wallace could not impeach Brown by recalling Johnson in his case in chief was erroneous under state law, the Court is not empowered to grant habeas relief based solely on this point.. *Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).[7] Rather, Wallace is entitled to relief only if he can show that the state court's evidentiary rulings amounted to a violation of the federal constitution. The Magistrate Judge concluded that Wallace made this showing with respect to his conviction of first-degree murder, and recommends that the Court find that the trial court's evidentiary rulings violated two separate constitutional provisions.

## (2) The Due Process Clause

■ First, the Magistrate Judge recommends that the Court hold that the trial court's evidentiary rulings denying Wallace the opportunity to admit evidence of Brown's statement that "he shot the girl" amounted to a violation of the due process clause of the Fourteenth Amendment. As set forth in the R & R, while "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense,'" *Crane v. Kentucky,* 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (quoting *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)), as a general rule, a state court's decision to exclude evidence

---

7. In fact, whether the state court's decision was an error under state law is not central to the Court's analysis. In *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), the trial court's evidentiary ruling was consistent with Mississippi's hearsay rule; nevertheless, the Supreme Court held that the exclusion of evidence under this state law rule violated the defendant's due process rights. .

does not implicate the federal constitution. *Id.* at 690, 106 S.Ct. 2142; *Chambers v. Mississippi*, 410 U.S. 284, 302–03, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Nonetheless, in certain cases, a state court's evidentiary ruling can go too far. *Crane*, 476 U.S. at 690, 106 S.Ct. 2142; *Chambers*, 410 U.S. at 302, 93 S.Ct. 1038. When a court excludes "competent," "reliable" evidence, *Crane*, 476 U.S. at 690, 106 S.Ct. 2142, that is "critical to [the defendant's] defense," *Chambers*, 410 U.S. at 302, 93 S.Ct. 1038, it runs a grave risk of violating the guarantee of fundamental fairness implicit in the due process clause. *Id.*

The seminal case that guides the Court in its analysis of whether the exclusion of evidence under state law violates the guarantee of fundamental fairness is *Chambers v. Mississippi*, 410 U.S. 284, 302–03, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). To briefly recap the facts of that case, Chambers was arrested and tried for the murder of a police officer. Shortly after the murder, a man named Gable McDonald made three statements to friends, admitting that he, and not Chambers, committed the crime. *Id.* at 292–93, 93 S.Ct. 1038. Later, McDonald actually gave a sworn confession to the crime—a confession that he subsequently withdrew. *Id.* at 287–88, 93 S.Ct. 1038. While the jury heard McDonald's confession and his later recantation, *id.* at 291, 93 S.Ct. 1038, it never heard testimony from McDonald's friends who claimed that McDonald had confessed to the crime. *Id.* at 292–93, 93 S.Ct. 1038. The trial court ruled that such testimony was hearsay and inadmissible. *Id.* Chambers was convicted, and his conviction was

affirmed by the Mississippi Supreme Court.

On a writ of certiorari, the Supreme Court of the United States reversed. Even though the trial court's ruling was in compliance with Mississippi's hearsay rule,[8] the *Chambers* Court held that state evidentiary law did not trump the dictates of due process. Four factors were crucial to the Court's decision.

> First, each of McDonald's confessions was made spontaneously to a close acquaintance shortly after the murder had occurred. Second, each one was corroborated by some other evidence in the case.... Third, ... each confession here was in a very real sense self-incriminatory and unquestionably against interest.... Finally, if there was any question about the truthfulness of the extrajudicial statements, McDonald was present in the courtroom and was under oath. He could have been cross-examined by the State, and his demeanor and responses weighed by the jury.

*Id.* at 300–01, 93 S.Ct. 1038. The Court continued: "In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id.* at 302, 93 S.Ct. 1038.[9]

It is against the *Chambers* backdrop that we analyze whether the trial court's evidentiary rulings violated Wallace's federal constitutional rights. In this regard, we adopt the Magistrate Judge's R & R in full and write only to address the Respondents' objections.

---

**8.** At the time, Mississippi recognized an exception to the hearsay rule for statements against pecuniary interest, but not for statements, like McDonald's, that were against penal interest. *Id.* at 299, 93 S.Ct. 1038.

**9.** There was a second error in *Chambers* as well. The trial court refused to allow the defendant to treat McDonald as an adverse witness and cross-examine him. *Id.* at 297–98, 93 S.Ct. 1038.

**(a) Brown made his statement spontaneously to a close acquaintance**

As to the first *Chambers* factor, the Respondents admit that the conversation between Brown and Johnson occurred within a short time after the murder between close acquaintances. (Dkt. no. 40 at 8). They argue, however, that the circumstances surrounding Johnson's recollection of the conversation and Wallace's cross-examination of her at trial distinguishes her testimony—and the reliability of Brown's statement to her—from the testimony that the Supreme Court found improperly excluded in *Chambers*.

**(i) Brown's marijuana use**

First, Respondents contend that Brown's conversation with Johnson purportedly took place in "an emotionally charged setting after Brown had smoked marijuana," (*id.*) and that, as a result, "there was some confusion as to what Anita [Johnson] interpreted his statement to be." (Hearing Tr. at 24). The Court finds that *Brown's* smoking of marijuana does not reflect upon Johnson's ability to recall what Brown said to her just a few days earlier or affect the reliability of her statement. Moreover, to the extent that Respondents are arguing that Brown's smoking of marijuana rendered his alleged confession less trustworthy, the Court further concludes that that point, if true, does not alter our conclusion that relief under *Chambers* is warranted. As discussed more fully below, the cumulative effect of the corroborative evidence supporting Wallace's theory that Brown's statement that "he shot the girl" bears sufficient indicia of reliability under *Chambers*.

**(ii) Johnson's hazy recollection**

Next, the Respondents attempt to make the general point that Johnson did not recall the details of her conversation with Brown—which by the time of Wallace's third trial had occurred more than six years earlier. Johnson's testimony does reveal that she was having difficulty recalling her conversation with Brown (Third Trial Tr. at 573, "Henry mentioned something about something."); however, the Respondents' contention only leads to more questions concerning the propriety of the trial court's evidentiary rulings. If Wallace was permitted to ask Johnson the question he wanted: "Did Brown tell you that he shot the girl?", and if Johnson responded that she could not remember, Wallace could have shown her the sworn statement she gave to police in an effort to refresh her recollection. Thus, it was precisely her lack of memory which would have rendered the utilization of her statement so appropriate and potentially invaluable. In the Court's view, there was at least a reasonable possibility that if shown her statement her memory may have been refreshed in a manner that inured to the benefit of Wallace. However, since the trial court did not permit Wallace to pose the question to Johnson, he never had the opportunity to refresh her recollection through the use of her statement to police. And, the jury was never given the opportunity to observe her demeanor, assess her credibility, and weigh her testimony regarding Brown's statements to her when it considered whether the Commonwealth met its burden of proving beyond a reasonable doubt that Wallace shot Spalla.

**(b) Brown's statement was corroborated by independent evidence**

**(i) sufficient corroborative evidence**

The Court has reviewed the evidence of record and concurs with the Magistrate Judge's conclusion that Brown's statement was corroborated by independent evidence. Brown admitted that he carried a .38 caliber handgun that was fully loaded on the

day of the murders. (Third Trial Tr. at 703–04). When the police recovered this weapon, however, one bullet was missing. (*Id.* at 560, 704). Johnson admitted that Brown showed her his gun after the murders had been committed and that she observed that one bullet was missing. (*Id.* at 560). The pathologist, Dr. Ernest Abernathy, who had training in ballistics, (*id.* at 282), noted that the slug removed from Spalla's body "would appear to be a short .38 caliber slug," (*id.* at 274–75, 277–78), the same kind that came from Brown's weapon. (*Id.* at 703–04). He also testified that the two exit wounds on Luisi were both 8 millimeters in diameter, (*id.* at 278–79), while the exit wound on Spalla was a different size, 10 millimeters. (*Id.* at 280–81). In addition, Brown's fingerprint was found on the cash register, just a few feet from where Spalla's body lay. (*Id.* at 244–45). Finally, Brown was perfectly positioned throughout the robbery to fire a direct shot through Spalla's chest. (*Id.* at 612–13).

This evidence is cumulatively corroborative of Wallace's theory that Brown shot Spalla with a .38 caliber handgun. When considered along with the other *Chambers* factors, they establish that Brown's statement that "he shot the girl" bears sufficient indicia of reliability. *See Chambers,* 410 U.S. at 300, 93 S.Ct. 1038.

The Respondents contend that the above-cited evidence does not corroborate Brown's statement, and note that much, but not all, of it was contested at trial. (*See* dkt. no. 40 at 9; Hearing Tr. at 25–29). However, *Chambers* does not require that the Court conclude that the corroborative evidence is irrefutable. Indeed, much of the evidence that the Supreme Court considered as corroborative in that case was disputed. *Chambers,* 410 U.S. at 289, 93 S.Ct. 1038.

When the Supreme Court considered the effect of the trial court's evidentiary ruling on Chamber's due process rights, it evaluated several pieces of corroborative evidence to McDonald's hearsay statements.[10] *Id.* at 300–01, 93 S.Ct. 1038. Much of that evidence was disputed by some other evidence in the case. For example, the Court noted that the testimony of one witness who stated that he saw McDonald shoot the victim was corroborative evidence to McDonald's statements. *Id.* However, that witness's testimony was directly disputed by the testimony of two police officers. One officer testified at the trial that he saw Chambers fire the shots that killed the victim. *See id.* at 286, 289, 93 S.Ct. 1038. Another officer testified that he saw Chambers "break his arm down" shortly after the fatal shots were fired. *Id.* at 286, 93 S.Ct. 1038. The Supreme Court also considered as corroborative evidence the testimony of one witness who stated that he saw McDonald with a gun in his hand immediately after the shooting. *Id.* at 301, 93 S.Ct. 1038. Yet, that witness's testimony was disputed by McDonald's claim that he had not been at the scene when the victim was shot, *id.* at 291, 93 S.Ct. 1038, and by the officers' testimony implicating Chambers as the shooter. *See id.* at 286, 289, 93 S.Ct. 1038. Finally, the Court found McDonald's sworn confession to be corroborative. *Id.*

---

10. In *Chambers,* the Court considered the following as corroborative evidence: (i) McDonald's sworn confession, (ii) the testimony of an eyewitness to the shooting, (iii) the testimony that McDonald was seen with a gun immediately after the shooting, and (iv) proof of McDonald's ownership of a .22 caliber revolver and subsequent purchase of a new weapon. *Id.* at 300–01, 93 S.Ct. 1038. The Court also noted that the fact that McDonald allegedly confessed to the crime on three different occasions also provided additional corroboration. *Id.*

at 300, 93 S.Ct. 1038. But, the effect of this evidence was tempered by McDonald's subsequent recantation and by his testimony as to why he felt pressured into making the confession. *Id.* at 291, 93 S.Ct. 1038.

Notwithstanding these disputes, the Supreme Court considered the evidence discussed above to be corroborative. *Id.* at 300–01, 93 S.Ct. 1038. And, it ultimately considered that evidence in reaching its conclusion that the excluded testimony regarding McDonald's confession "bore persuasive assurances of trustworthiness." *Id.* at 302, 93 S.Ct. 1038.

Thus, *Chambers* does not require that the corroborative evidence have the degree of irrefutability that Respondents suggest. Instead, a court must examine the quality of the evidence collectively to determine if the out-of-court statement at issue bears adequate indicia of reliability. *See id.* at 300–01, 93 S.Ct. 1038. If the court determines that it does, it then becomes the jury's task to determine how the disputed evidence affects the prosecution's burden to prove guilt beyond a reasonable doubt.

In this case, the Court concurs with the Magistrate Judge that there is sufficient corroborative evidence to support the trustworthiness of Brown's statement.

### (ii) ambiguity of Johnson's statement

In contesting the Magistrate Judge's recommendation regarding corroboration, Respondents argue that the portion of Anita Johnson's sworn statement in which she recounts Brown's confession to her is ambiguous. (Dkt. no. 40 at 10–11). They claim that the "he" in "he shot the girl," refers to Wallace, not Brown. Consequently, they argue that Johnson's statement, coupled with the other evidence in the case implicating Wallace in the crime, supports their theory that Wallace shot Spalla and undercuts the Magistrate Judge's conclusion that there was suffi-

cient corroborative evidence to support relief under *Chambers*. (Dkt. no. 40 at 12). We disagree.

Initially, the Court notes that the Commonwealth never argued at trial that Johnson's statement was ambiguous. (Hearing Tr. at 12, 16–17). Also, it is clear from the record that throughout the case all the parties and the trial court operated under the assumption that the "he" in Johnson's statement "he shot the girl" referred to Brown. Indeed, the trial court's evidentiary rulings at issue were made upon the implicit, and unchallenged, premise that the "he" in Johnson's statement referred to Brown. In any event, even if it cannot be said in the context of the entire statement that the word "he" indisputably refers to Brown, it is at least beyond dispute that a jury could have reasonably so concluded. At the hearing the before this Court, Respondents' counsel conceded as much. (Hearing Tr. at 19).

### (c) Brown's statement was self-incriminating

As noted by the Magistrate Judge, the third *Chambers* factor, which requires an inquiry as to whether the statement at issue was self-incriminatory and unquestionably against interest, *Chambers*, at 410 U.S. at 300–01, 93 S.Ct. 1038, is easily met. To counter this conclusion, the Respondents contend that, since their position is that the "he" in Johnson's statement refers to Wallace, Brown did not make a statement that was self-incriminatory. We reject this argument for the reasons discussed above, and conclude that the circumstances here are sufficient to support Wallace's proposition that Brown made a statement that was self-incriminating and against his penal interest.

### (d) Brown was present at trial

As to the fourth and final *Chambers* factor, Brown was present throughout the

trial. As the Magistrate Judge explained, if the trial court admitted Brown's statement, he would have had a chance to elaborate on it, clarify it, or recant it. With all the facts before it, the jury could have scrutinized his demeanor and weighed his credibility. *Id.* at 301, 93 S.Ct. 1038. Because the trial court barred the admission of Brown's statement, however, the jury in Wallace's case was never given the opportunity.

\* \* \*

In sum, based on the Magistrate Judge's R & R and the foregoing discussion, the Court concludes that Brown's statement was originally made and offered at trial under circumstances that provided considerable assurances of its reliability. *Id.*

### (e) The Commonwealth's closing argument

In the Court's view, the appropriateness of our finding a *Chambers* violation is further driven by the conduct of the prosecution in the closing of its case. In its closing argument, the Commonwealth stated:

> [I]t was represented to you that Mr. Brown said he was responsible and that he pled guilty two or three times, *but has it ever been said to you by anyone that Mr. Brown at any time said I shot Carl and Tina?* He knows he was there. He's lived on the wrong side of the law at times and he knows to be there is to be responsible. *But he also, in his heart and his mind, knows the difference between being responsible and between pulling the trigger.*

(Third Trial Tr. at 924–25 (emphasis added)). It reminded the jury that, as the Magistrate Judge discusses in another context, Wallace never "dropped the other shoe" by proving through other evidence that Brown actually made the statement in question.

The Commonwealth acknowledged the problematic nature of the prosecution's closing argument at the hearing before this Court. (Hearing Tr. at 29).

> THE COURT: Let's talk about the other shoe dropping in the context of which Magistrate Judge Caiazza uses the term in his report. Isn't part of the problem here, insofar as this *Chambers* issue is concerned, that the problem was exacerbated this way. The prosecution's closing at the end of the case, the prosecution, for lack of a better term, poured salt in an open evidentiary wound and almost suggested to the jury the fact that the other shoe hadn't dropped. That's problematic, isn't it; would it have been better from an evidentiary standpoint, from the Commonwealth's position, that that had not occurred?
>
> MR. FAGELLA: Well, in hindsight I wish they didn't say that....

(Hearing Tr. at 29). Later, in response to the Court's observation that the Commonwealth fought at every point at trial to keep Brown's statement out and then indicted Wallace before the jury for not bringing that same evidence in, Respondent's counsel conceded: "Well, I guess it should have been suggested or phrased a little bit better." (*Id.* at 30).

For all the above reasons, we conclude that Wallace was deprived of a fundamentally fair trial with respect to his first-degree murder conviction.

### (f) Conclusion

Accordingly, the trial court's evidentiary rulings that prevented Wallace from exploring the circumstances of Brown's statement rendered his trial fundamentally unfair and deprived him of due process of law with regard to his first-degree murder conviction. *Chambers,* 410 U.S. at 300–01, 93 S.Ct. 1038.

### (3) The Confrontation Clause

■ The Magistrate Judge also recommends that the trial court's evidentiary rulings violated the confrontation clause of the Sixth Amendment. This constitutional provision provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." U.S. Const. amend. VI. The Supreme Court has interpreted this provision to provide a criminal defendant with two distinct rights: the right to face or "confront" those who testify against him; and the right to conduct cross examination. *Pennsylvania v. Ritchie,* 480 U.S. 39, 51, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987).

In the present case, Wallace claims that, by denying him the right to introduce Brown's prior statement, the trial court interfered with his right of cross-examination. For the reasons set forth in the R & R, we agree with the Magistrate Judge's conclusion that the trial court's evidentiary rulings barring Wallace from exposing to the jury the facts concerning Brown's statement that he "shot the girl" rose to the level of a violation of the confrontation clause of the Sixth Amendment. *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

The Respondents' objections to the Magistrate Judge's recommendation on this claim are essentially that even if there was a Sixth Amendment violation, the error was harmless. (Dkt. no. 40 at 13–15). The Magistrate Judge explains in full detail why the constitutional error here was *not* harmless, and the Court will only add to his analysis to briefly address the Respondents' contention to the contrary.

The Respondents contend that "Johnson's testimony would not have been of much use" because she "could not remember the details of her conversation" with Brown. (*Id.* at 13). The Court disagrees.

As we stated previously, it was Johnson's lack of memory which would have rendered the utilization of her statement so appropriate and potentially invaluable because there was at least a reasonable possibility that if shown the statement Johnson's memory may have been refreshed in a manner that inured to the benefit of Wallace.

Finally, the Respondents attempt to distinguish this case from *Davis v. Alaska* by noting that in that case, "no mention *at all* was given as to the witness's probationary status." (Dkt. no. 40 at 14). The Respondents contrast that point with their contention that in this case "the record is replete with instances where the jury knew that a statement had been given by Johnson to the police concerning what Brown had told her.... It is beyond belief that any juror could not have understood that a statement had been given and that there was an admission of some type as to Brown's involvement with the shooting of Spalla." (*Id.* at 14–15). The Court disagrees. As addressed above, the Commonwealth's closing argument emphasized to the jury that Wallace never produced any evidence that Brown "at any time said I shot Carl and Tina[.]" (Third Trial Tr. at 924–25). Further, it seems unduly speculative to assume that the jury reached an independent conclusion that the statement contained an admission by Brown.

In conclusion, for the reasons set forth in the R & R, the Court determines that the trial court's evidentiary ruling was a serious error that rose to the level of a violation of the confrontation clause of the Sixth Amendment with respect to Wallace's conviction for first-degree murder.

### (4) The Remaining Convictions

■ As recommended by the Magistrate Judge, the Court holds that the trial

court's exclusion of Brown's statement violated the Sixth and Fourteenth Amendments. For the reasons stated in the R & R, the Court further holds that those constitutional errors " 'had a substantial and injurious effect or influence in determining the jury's verdict[ ]" with respect to Wallace's conviction for first-degree murder. *See Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).[11]

The Court reaches the opposite conclusion, however, on Wallace's convictions for second-degree murder, robbery, and conspiracy. We concur with the Magistrate Judge that the trial court's refusal to admit Brown's prior statement was harmless with respect to the other charges against him. The Court is not persuaded by Wallace's objections to the contrary. (*See* dkt. no. 39 at 3–5; Hearing Tr. at 4–7). In fact, Wallace's counsel conceded at the hearing before this Court that the trial court's evidentiary rulings had a greater effect on his first-degree murder conviction than they did on his remaining convictions. (Hearing Tr. at 7).

Accordingly, for the foregoing reasons and for the reasons set forth in the R & R, the Court overrules the Respondents' and Wallace's objections to the R & R with respect to Claim I of his Amended Petition. The Court adopts the Magistrate Judge's recommendation that Wallace's Fourteenth Amendment and Sixth Amendment claims be granted with respect to his

first-degree murder conviction and denied with respect to his remaining convictions. Finally, the Court grants Wallace a certificate of appealability on his claim that the constitutional errors were not harmless with respect to his remaining convictions. *See* 28 U.S.C. § 2253(c)(2).

**B. The Deal That Secured Henry Brown's Testimony**

■ Wallace argues that the Commonwealth violated his rights under the due process clause of the Fourteenth Amendment when it intentionally manipulated the judicial process in order to secure the testimony of Henry Brown.[12] The Pennsylvania Supreme Court addressed the merits of this federal constitutional claim, *Wallace II,* 561 A.2d at 726. It succinctly denied the claim, concluding that "every aspect of the bargain between Brown and the prosecution was presented to the jury in painstaking detail and ... nothing was hidden from their scrutiny." *Id.* at 726. Because the claim was fairly presented to the state courts and addressed on its merits, the only issues that this Court must resolve are whether Wallace has shown that the Pennsylvania Supreme Court's decision, was "contrary to" or an "unreasonable application of" "clearly established Federal law," or "resulted in a decision that was contrary to, or involved an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).[13] For the

---

**11.** Under *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), a writ of habeas corpus may issue only if the reviewing court finds that the constitutional error " 'had a substantial and injurious effect or influence in determining the jury's verdict.' " *Id.* at 637, 113 S.Ct. 1710 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

**12.** This is Claim II in Wallace's Amended Petition, dkt. no. 12, Claim II, at 21.

**13.** Wallace filed his petition for habeas corpus relief after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132 § 104, 110 Stat. 1214, so that statute applies to his case. *See Lindh v. Murphy,* 521 U.S. 320, 326–27, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

following reasons, the Court concludes that none of these standards have been met.

### (1) Factual Background

The Magistrate Judge provides the complete factual background to this claim, and the Court will only briefly summarize it here.

As detailed in the R & R, the Commonwealth went to extraordinary lengths to secure Brown's testimony against Wallace. At each of Wallace's two previous trials, Brown did not testify, even though he had given a statement to the police admitting his own complicity in the robbery and implicating Wallace in the murders of Luisi and Spalla. Twice Brown had pled guilty to two counts of second degree murder. (Third Trial Tr. at 653, 665–66). Twice he had been sentenced to life in prison. (*Id.; see also id.* at 108). And twice, he had refused to testify against Wallace. (*Id.* at 662–64, 669, 672). As the date of Wallace's third trial approached, Brown was still serving a life sentence and still refusing to testify against Wallace.

In order to secure Brown's testimony once and for all, the Commonwealth offered Brown what defense counsel called "the deal of the century." (*Id.* at 689). The deal was this: if Brown agreed to testify against Wallace, then his life sentence would be reduced to ten to twenty years, with a credit for six years served, and a guarantee that the Commonwealth would recommend parole at the earliest possible date. (Plea Agreement, ¶¶ 1(c)-(d), 2, 5–6). Brown accepted the deal and agreed to testify against Wallace at his third trial.

While the terms of their agreement were clear enough, a number of hurdles

stood in the way. Neither Brown nor the District Attorney had the power to alter a guilty plea that had been entered in open court and accepted by a state judge. Also, at that time, Pennsylvania law did not permit the withdrawal of a guilty plea or modification of a sentence more than ten days after the imposition of the sentence. Pa.R.Crim.P. 321 & 1410 (West 1985). Accordingly, to secure judicial blessing for their deal, Brown and the Commonwealth had to take a different tack.

The course they charted was this: a petition would be filed challenging Brown's earlier guilty plea under the Pennsylvania Post Conviction Hearing Act ("PCHA").[14] On the first morning of Wallace's third trial, Brown's attorney, Paul Gettleman, presented this petition to Judge Gladden of the Court of Common Pleas for Washington County. (Third Trial Tr. at 108, 333). In it, Gettleman argued that he was ineffective when he represented Brown during the negotiation of his second plea agreement. (*Id.* at 339). He then asked that Brown be allowed to withdraw that earlier guilty plea. (Plea Agreement, ¶ 1(a)). The Commonwealth did not oppose the request, (Third Trial Tr. at 334), and, in fact, "concede[d] that Henry Eugene Brown should be permitted to withdraw his guilty plea ... for the reasons cited in the PCHA petition." (Plea Agreement, ¶ 1(b)). In addition, both parties asked Judge Gladden to accept a new plea agreement under which Brown would plead to third-degree murder and be sentenced to ten to twenty years. (*Id.* ¶ 1(c)). Judge Gladden permitted Brown to withdraw his guilty plea and accepted the new agreement of the parties. (Third Trial Tr. at 337).

---

**14.** The PCHA was repealed April 13, 1988, and replaced by the PCRA, 42 Pa.Cons.Stat. Ann. §§ 9541–9546.

As the Magistrate Judge noted, there were obvious problems with the PCHA proceedings that paved the way for Brown's new plea agreement. The proceedings themselves were sapped of their adversarial nature and became nothing more than a mere rubber stamp for the agreement reached by Brown and the Commonwealth. No hearing was held, and Brown was never questioned by the court. (*Id.* at 342–43). The Commonwealth, usually a fierce adversary in such proceedings, conceded the merits of Brown's petition and even went so far as to ask the court to grant the relief requested. Additionally, as a general rule, Pennsylvania law prohibits an attorney from raising his own ineffectiveness. *Commonwealth v. Fox*, 476 Pa. 475, 383 A.2d 199, 200–01 (1978).

### (2) Prosecutorial Misconduct Claim

While the above-described scenario is troublesome on many levels, we find no basis upon which to grant Wallace relief.

■ As noted by the Magistrate Judge, "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). The Magistrate Judge further correctly observes that, whatever the Commonwealth might have done, Wallace's trial was basically fair. The jury heard nearly everything about the substance of the deal between Brown and the Commonwealth and the way that it implicated Brown's credibility. On cross-examination alone, Brown recounted his two previous guilty pleas, his refusal to testify on two previous occasions, and the fact that he was serving two life sentences on the eve of Wallace's trial. (Third Trial Tr. at 653, 656, 661–64, 666, 669, 672). The jury learned that Wallace had challenged

his second guilty plea and that the challenge had been rejected by the same judge who presided over Wallace's trial. (*Id.* at 684). It heard about the last minute deal and, in broad terms, how it came about. (*Id.* at 655, 671–72, 685–88). Brown's plea agreement was read to the jury, paragraph by paragraph, for its consideration. (*Id.* at 685–88). During cross-examination alone, questioning concerning Brown's deal spanned nearly forty pages, (*id.* at 651–89), and must have consumed more than an hour of trial time. Finally, counsel for both sides discussed Brown's deal in their closing arguments. (*Id.* at 901–02, 930–32). All of this evidence sheds light on Brown's deal, his reasons for testifying, and his credibility.

Because the jury was exhaustively informed as to the nature of the plea agreement between Brown and the Commonwealth, the Commonwealth's conduct did not run afoul of due process. Regardless of the alleged improprieties in securing Brown's testimony in the manner in which it did, the extensive information received by the jury about Brown's "deal of the century" rendered the trial fundamentally fair.

Wallace takes issue with the above conclusion because the jury never heard his theory that the PCHA proceedings that secured Brown's agreement with the Commonwealth were illegal under state law or otherwise improper. In support, he notes that neither Brown nor the District Attorney had the power to alter Brown's previous guilty plea, which had been entered in open court and accepted by a state judge. To overcome this obstacle, Wallace contends that the Commonwealth—"with the willing complicity of the trial court," (dkt. no. 39 at 7)—orchestrated the PCHA proceedings, which were not "authorized in Pennsylvania law or Pennsylvania procedure" (Hearing Tr. at 35), in order to

secure the outcome it desired. It is this purported complicity by the trial court, Wallace argues, that so infected the trial with unfairness as to render the resulting conviction a denial of due process. (Dkt. no. 39 at 12).

The Court rejects Wallace's argument for two reasons. First, the alleged impropriety of the PCHA proceedings was not germane to the jury's assessment of Brown's credibility. Indeed, Wallace's counsel admitted as much at the hearing before this Court. (Hearing Tr. at 34). Second, had the trial court admitted evidence about the irregularities of the PCHA proceedings, it would have created an unwieldy mini-trial that was more likely to confuse the jury than inform it. For both of these reasons, the fact that the jury was not able to consider the suspect nature of the PCHA proceedings did not render Wallace's trial fundamentally unfair.

Most importantly, however, the Court overrules Wallace's objections to the Magistrate Judge's recommendation on this claim because the Supreme Court of Pennsylvania addressed the claim and rejected it on its merits. Just recently, the Supreme Court of the United States strongly reiterated the principle that federal courts should not substitute their own judgment for that of a state court on matters of federal law, including legal issues that involve an interpretation and application of facts. *Woodford v. Visciotti*, 537 U.S. 19, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam); *Early v. Packer*, 537 U.S. 3 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam).

Therefore, for the reasons set forth in the R & R and herein, the Court concludes that the state court's decision rejecting this claim was neither "contrary to" nor "an unreasonable application of" "clearly established Federal law," 28 U.S.C. § 2254(d)(1); nor did it "result[ ] in a decision that was contrary to, or involved an unreasonable determination of the facts in light of the evidence presented in the state court proceeding[,]" 28 U.S.C. § 2254(d)(2). Accordingly, Wallace is not entitled to federal habeas relief on Claim II in his Amended Petition. However, because Wallace has made a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), he is entitled to a certificate of appealability on this claim.

## C. Counsel's Failure to Obtain an Independent Ballistics Exam

■ Wallace claims that he received ineffective assistance due to his trial counsel's failure to obtain an independent ballistics exam.[15] The Magistrate Judge recommends that the Court deny Wallace relief on this claim. For these reasons set forth below, the Court agrees and adopts that recommendation.

At trial, the Commonwealth advanced the theory that Wallace shot both Spalla and Luisi with a .32 caliber pistol—a weapon that was never recovered. In support of its theory, the Commonwealth presented Trooper Daryl Mayfield, a ballistics expert for the Pennsylvania State Police, who had examined the bullet slugs that had been retrieved from the body of each victim. (Third Trial Tr. at 289–94). Trooper Mayfield testified that, although he could not match the slugs to any particular weapon, he was of the opinion that each slug had been discharged from the same weapon—a .32 caliber pistol. (*Id.* at 291–92, 294). Anita Johnson and Henry Brown each testified that Wallace was a carrying a .32 caliber weapon on the day of

---

**15.** This is Claim III.D in Wallace's Amended Petition, dkt. no. 12, Claim III.D, at 36.

the murders, thereby linking Wallace to the alleged murder weapon. (*Id.*)

As pointed out by the Magistrate Judge, there were three pieces of evidence that cast doubt on the Commonwealth's theory with regard to the bullet that killed Spalla. First, the pathologist, Dr. Abernathy, testified that the slug pulled from Spalla's body "appeared to be a short .38 caliber slug." (*Id.* at 274–75, 277–78). Second, Henry Brown admitted to carrying and firing a .38 caliber weapon on the day of the murders. (*Id.* at 560, 703–04). Finally, Anita Johnson told the police that Brown had confessed to shooting Spalla. (Johnson Statement, dkt. no. 20, at 24–25).

Based on this evidence, Wallace's trial counsel attempted to prove that Brown shot and killed Spalla. In this regard, he extensively cross-examined Dr. Abernathy on his statement that the slug pulled from Spalla appeared to be a .38. (Third Trial Tr. at 280–82). By doing so, he tried to demonstrate that the slugs examined by Mayfield were not the same ones that had been retrieved from Spalla's and Luisi's bodies. (*Id.* at 272, 274, 282, 294, 894–96). Finally, he attempted, albeit unsuccessfully, to introduce Johnson's statement that Brown told her that "he shot the girl."

Despite his counsel's efforts, Wallace claims that he is entitled to habeas relief because his counsel failed to retain an expert to perform an independent ballistics test in order to prove that the slug pulled from Spalla was a .38 caliber.

As set forth in detail in the R & R, in order to establish that trial counsel rendered constitutionally ineffective assistance, a petitioner must demonstrate: (1) that "counsel's representation fell below an objective standard of reasonableness"; and (2) that the deficient performance actually prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Magistrate Judge addresses in depth the circumstances that would likely support a finding that Wallace's trial counsel's articulated reasons for not hiring an independent ballistics expert were objectively unreasonable, and the Court will not restate them here. Nevertheless, even if the Court were to hold that Wallace's trial counsel's representation on this point fell below an objective standard of reasonableness, Wallace's claim still fails because he has not put forth sufficient evidence to demonstrate that he has been prejudiced by counsel's conduct.[16]

To prove prejudice, Wallace must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. A reasonable probability is one which is sufficient to undermine confidence in the outcome. *Id.* Here, Wallace has not produced anything beyond mere speculation that an independent ballistic test would have supported the defense theory that the bullet that struck Spalla was, in fact, a .38 caliber bullet. Therefore, he has not produced any evidence from which the Court could conclude that there is a reasonable probability that the result of the proceeding would have been different had his counsel obtained an independent ballistics exam.

At the hearing before this Court, Wallace's counsel candidly conceded that Wallace has not produced any evidence of

---

**16.** The Court in *Strickland* noted that although it had discussed the performance component of an effectiveness claim prior to the prejudice component, there is no reason for an analysis of an ineffectiveness claim to proceed in that order. 466 U.S. at 697, 104 S.Ct. 2052. Consequently, if it is more efficient to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, this course should be followed. *Id.*

record to support his claim that he was prejudiced by counsel's conduct. (Hearing Tr. at 43–44). To cure this defect, Wallace's counsel acknowledged that the Court would have to conduct an evidentiary hearing to allow Wallace to present additional evidence. (*Id.* at 44). However, the Court need not address Wallace's request to further develop the record. This entire claim is an attack only on Wallace's first-degree murder conviction, a conviction on which the Court has already decided to grant relief. The Court, therefore, concurs with the Magistrate Judge that since the caliber of the bullet used to kill Spalla was not relevant to the charges of robbery, conspiracy, and second-degree murder, it is not necessary at this time, assuming that Wallace is entitled to do so, to develop the record further.

For all the reasons set forth above, the Court overrules Wallace's objection and adopts the Magistrate Judge's recommendation that Wallace is not entitled to federal habeas corpus relief on Claim III.D of the Amended Petition. The Court further holds that a certificate of appealability on the claim is denied.

### D. *Massiah* Claim

Wallace also takes exception to the Magistrate Judge's recommendation that the Court deny relief on his claim that his Sixth Amendment right to counsel was violated when the Commonwealth employed Olen Clay Gorby as an agent to deliberately elicit incriminating statements from him concerning the murders of Spalla and Luisi.[17]

As the Magistrate Judge explains in the R & R, Gorby, a former fellow inmate of Wallace, testified as a witness for the prosecution at each of Wallace's trials. At each trial, Gorby testified that Wallace confessed to firing the gun that killed both Spalla and Luisi. (Third Trial Tr. at 759–60). Wallace denies ever having discussed his case with Gorby and denies having made the confession now at issue. That being said, Wallace claims that Gorby's testimony was inadmissible under *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

The Court concurs with the Magistrate Judge's recommendation that Wallace is not entitled to relief on this claim. Before the Court addresses Wallace's objections to this recommendation, we briefly outline the relevant facts. The Court concurs with the Magistrate Judge's recommendation that Wallace is not entitled to relief on this claim. Before the Court addresses Wallace's objections to this recommendation, we briefly outline the relevant facts.

### (1) Factual Background

In November 1979, shortly after Wallace was arrested for the murders of Spalla and Luisi, Gorby was arrested in Pennsylvania and charged with multiple offenses, unrelated to Wallace's crime. (Dkt. no. 20 at 72). Gorby agreed to testify against his co-defendants in all of the cases brought against him, and he began cooperating with the Commonwealth, working particularly with Trooper William Cunningham, who was also the lead investigator on Wallace's case. (*Id.* at 72). A month later, Gorby met assistant District Attorney Daniel Chunko, the prosecutor on Wallace's trial, (*id.*), and told him that he knew Wallace from having been incarcerated with him in the West Virginia Penitentiary. (*Id.*)

In January 1980, Gorby was released from jail to work as an informant for the Federal Bureau of Alcohol, Tobacco, and Firearms ("ATF"). (*Id.* at 73). When this

---

**17.** This is Claim VI in Wallace's Amended Petition, dkt. no. 12, Claim VI, at 49.

stint was over, Trooper Cunningham arrested Gorby—at Gorby's request—to get him "off the street" to protect him from reprisals. (*Id.*) At the time, Gorby was placed in the Washington County jail. But Gorby's fear of retaliation due to his role as a government informant did not dissipate. Eventually, the Commonwealth stepped in again to protect him, and Gorby was transferred from the Washington County jail to the Greene County jail. (*Id.* at 73–74).

A few months later, Gorby was back in the Washington County jail. (*Id.*) Shortly thereafter, on July 11, 1980, Wallace himself was extradited from West Virginia and placed in the Washington County jail in a cell next to Gorby. (*Id.* at 74). Two days later, on July 14, 1980, Gorby gave a formal statement to Trooper Cunningham, prosecutor Chunko, and District Attorney Bigi implicating Wallace in the robbery of Carl's Cleaners and the murders of Spalla and Luisi. (*Id.*)

In May 1981, after the first two trials but before the Pennsylvania Supreme Court had remanded for a third, Gorby was sentenced on the multiple charges that had been pending against him for his November 1979 arrest. (Trial Ct. Op., 11/20/81, at 528E). Although Gorby originally agreed to a sentence of five to ten years on these charges (*id.*), the trial court, at the recommendation of the Commonwealth, sentenced him to a term of probation. (*Id.*) He was immediately released from jail.

### (2) *Massiah* Factors

 As the Magistrate Judge explains in the R & R, whether an informant's testimony violates the Sixth Amendment turns on the existence of three factors. First, the right to counsel must have attached at the time that the alleged incriminating statements were made to the in-

formant. *Matteo v. Superintendent, SCI Albion,* 171 F.3d 877, 892 (3d Cir.1999) (*en banc* ). Second, the informant must have been working as a government agent. *Id.* at 892. Finally, the informant must have "deliberately elicited" incriminating information from the defendant. *Id.* at 892. There is no dispute that Wallace has satisfied the first factor under *Massiah.* The Magistrate Judge, however, recommends that the Court deny Wallace relief on this claim because he cannot satisfy *Massiah's* second and third factors.

### (1) Was Gorby an agent under *Massiah?*

[11] Wallace contends that Gorby was acting as a government agent at the time that the incriminatory statements at issue were made. To satisfy his burden of proving that Gorby was a government agent, Wallace must produce "some evidence that an agreement, express or implied, between the individual and a government official existed at the time the elicitation [took] place." *Matteo,* 171 F.3d at 893; *see also United States v. Brink,* 39 F.3d 419, 423 (3d Cir.1994). As noted by the Magistrate Judge, the Third Circuit has pointed to a number of different factors that should be considered when deciding whether such an agreement exists. First, was the informant "acting under instructions" from the government to obtain information from the defendant? *Id.* at 893–94. Second, was there a "quid pro quo—in which the informant receive[d] some type of benefit, even if nonpecuniary, in exchange for assisting the authorities[?]" *Id.* at 894. Third, was there a past agency relationship between the informant and the government? *Id.* at 893; *Brink,* 39 F.3d at 423. Fourth, was the informant "ostensibly a mere fellow inmate . . ." *id.* at 893, thus, hiding from the defendant the fact that he is talking to a government agent? *United States v.*

*Henry,* 447 U.S. 264, 272–73, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). Fifth, was the defendant "in custody at the time" and, therefore, subject to the " 'subtle influences that will make him particularly susceptible to the ploys of undercover [g]overnment agents[?]' " *Matteo,* 171 F.3d at 895 (quoting *United States v. Henry,* 447 U.S. 264, 274, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980)). Finally, was the informant a "trusted friend" and, therefore "more likely to" obtain "incriminating statements" from the defendant? *Id.* at 894–95.

The Magistrate Judge determined that Wallace cannot satisfy either of the first two factors of the *Matteo*-agency test, and accordingly recommends that the Court deny Wallace relief on this claim. In his objection to this recommendation, Wallace contends that the Magistrate Judge improperly deferred to state court findings that do not "qualify for deferential review under AEDPA." (Dkt. no. 39 at 30). He claims that Gorby was "acting under instructions" from the government to obtain information from Wallace and that there was a "quid pro quo" between Gorby and the Commonwealth.

### (i) The PCRA court's determination that Wallace was not an agent

■ In making his recommendation that the Court reject Wallace's *Massiah* claim, the Magistrate Judge cites specific factual findings made by the state court that preclude Wallace from meeting his burden of proving that Gorby was acting as an agent for the Commonwealth. The first state court fact findings referenced by the Magistrate Judge were those made by the PCRA court (Judge Bell) when it ruled upon Wallace's PCRA petition. In its December 5, 1995 Opinion denying Wallace post conviction relief after his third trial, the PCRA court rejected Wallace's claim that the trial court erred in permitting Gorby to testify to Wallace's incriminating statements. (*See* PCRA Ct. Op., 12/5/95, at 14–15). Therein, the court referenced its December 6, 1980 decision denying Wallace's motion to suppress Gorby's testimony. (*Id.*) It noted that in denying the suppression motion, the court found "no evidence that Mr. Gorby was acting as an agent of law enforcement[.]" [18] (*Id.*) In ruling on Wallace's PCRA claim, the court further noted that Wallace failed to produce evidence that Gorby was acting as an agent for the Commonwealth during either the PCRA proceedings or any pre-trial hearing. (*Id.*) Thus, based on all of these factors, the PCRA court held that Gorby was not acting as an agent of law enforcement at the time Wallace made the inculpatory admissions to him. (*Id.*)

■ Wallace fails to advance any convincing argument as to why the PCRA court's factual finding should not be accorded AEDPA's presumption of correctness pursuant to 28 U.S.C. § 2254(e)(1). [19] Under this provision, federal courts in habeas corpus cases must apply a presumption of correctness to state court factual findings, which the petitioner can overcome only by clear and convincing evidence. *Id.* This presumption applies to

---

18. The PCRA court's conclusion is consistent with the court's statement during Wallace's third trial that it had previously made a "factual determination that [Gorby] was not a police agent or informant for the purposes of interviewing Wallace," (Third Trial Tr. at 777).

19. 28 U.S.C. § 2254(e)(1) provides: "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgement of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

the factual determinations of both state trial (including PCRA) courts and appellate courts, see *Dickerson v. Vaughn,* 90 F.3d 87, 90 (3d Cir.1996). Wallace argues that the Court should not defer to the PCRA court's findings because the Pennsylvania Supreme Court—which deemed Wallace's *Massiah* claim waived—never reviewed it on appeal. The Court is not persuaded. There is no requirement that fact findings by a state trial court be reviewed on the merits by an appellate court in order to be afforded the presumption. 28 U.S.C. § 2254(e)(1).

### (ii) Judge Bell's determination that there was no "quid pro quo"

The Court must also analyze Wallace's *Massiah* claim with reference to Judge Bell's November 20, 1981 factual determinations, made after the second trial, that there was no "quid pro quo" between Gorby and the Commonwealth.

In his November 20, 1981 Opinion and Order, Judge Bell denied Wallace's motion for new trial based upon after discovered evidence. Wallace's motion was premised on two bases: (1) that Gorby "testified in return for various considerations offered by the District Attorney," and (2) that the "District Attorney misrepresented [Gorby's] testimony to the Court and jury as voluntary and credible." (Trial Court Op., 11/20/81, at 528F–G).

In support of his contention that there was a quid pro quo between Gorby and the Government with respect to Wallace's case, Wallace presented the testimony of Ronald Van Ostran. (*Id.*) Van Ostran claimed that Gorby told him that the Commonwealth promised Gorby that he would be released from all charges if he testified against Wallace and that Gorby was receiving a $1,000 payment from the victims' families. After conducting several hearings in which Ronald Van Ostran testified

for the defense and Gorby, his estranged wife Debra, Trooper Cunningham, District Attorney Herman Bigi, and other members of the district attorney's office testified for the Commonwealth, Judge Bell denied Wallace's motion. In so doing, he rejected, as a matter of fact, all of the same allegations that Wallace now raises. (Trial Ct. Op. 11/20/81, at 528F–G).

Judge Bell credited the testimony of the Commonwealth's witnesses over Van Ostran and found that Gorby's "recommended probationary sentence was not connected in any way with the testimony given in the Wallace case." (*Id.* at F28G). He further found that neither Gorby nor his wife received any money in exchange for his testimony and that there was no evidence "that a secret bargain was entered into to secure testimony from Mr. Gorby." (*Id.*) In addition to these determinations regarding an alleged "quid pro quo" between Gorby and the Commonwealth, Judge Bell also determined that there was "no evidence … shown to convince us that perjured testimony was acquired." (*Id.*) Accordingly, Judge Bell denied Wallace's motion for new trial on each basis raised in support.

Wallace contends that Judge Bell's fact determinations are not entitled to the presumption of correctness because the Supreme Court of Pennsylvania eventually reversed the verdicts of guilt rendered at the second trial and granted Wallace a retrial. We disagree.

The Supreme Court of Pennsylvania did ultimately grant Wallace a new trial based on his claims that the district attorney failed to correct certain false testimony of Gorby and failed to provide defense counsel with Gorby's complete criminal background and record. *Wallace I,* 455 A.2d at 1193. Its decision did not, however, alter Judge Bell's determination that Gorby and the Commonwealth had not struck a bar-

gain to secure testimony against Wallace. As the Magistrate Judge noted, the factual findings made on the issue now before the Court were expressly left undisturbed by the Supreme Court "[b]ecause these findings on credibility are supported by the record[.]" *Wallace I*, 455 A.2d at 1191 n. 5. Accordingly, the Court is bound by Judge Bell's November 1981 findings as well.

In sum, the factual findings made by the PCRA court and the state trial court, both presided over by Judge Bell, are the quintessential findings which bind federal habeas courts in the absence of clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). On at least two occasions, Judge Bell presided over hearings in which he heard testimony from Gorby and numerous other witnesses regarding Gorby's relationship with the Commonwealth in Wallace's case. Judge Bell observed each witness's demeanor and assessed each witness's credibility. He made determinations based on his observations. And, in the absence of any clear and convincing evidence to the contrary, this Court is bound Judge Bell's factual determination in assessing Wallace's constitutional claim. Consequently, the Court will review Wallace's *Massiah* claim with the previously described deference to the state court's factual determinations.

### (iii) State court factual findings preclude relief

█ Wallace's *Massiah* claim fails because he cannot show that Gorby was "acting under instructions" from the government to obtain information from Wallace, nor can he show that there was a "quid pro

quo" between himself and the Commonwealth. *Matteo*, 171 F.3d at 893–94. He claims in his objections that the presence of the other *Matteo* factors constitutes "overwhelming circumstantial evidence of a tacit agreement" between Gorby and the Commonwealth, and that the "only minimal contrary evidence is Gorby's denial of an explicit deal." [20] (dkt. no. 39 at 32). However, those factors taken together are insufficient to prove that Gorby was a government agent under *Massiah*.

Moreover, the state court findings on this point were based upon far more evidentiary support than simply Gorby's "denial of a deal." Specifically, the judge ultimately concluded that Gorby's denial of any agreement between himself and the Commonwealth was rendered more credible because it was corroborated by members of the District Attorney's office, the state police, and Debra Gorby. (Trial Court Op., 11/20/91, at 528F–G). Debra Gorby, whom Judge Bell noted was "separated from her husband and ... did not seem to have any bias or inclination to blindly affirm" Gorby's testimony, countered Van Ostran's testimony and stated that she never received any money from the victims' families in exchange for Gorby's testimony against Wallace. (*Id.* at 528F). In addition, Judge Bell determined, based upon the testimony of members of the District Attorney's office and Trooper Cunningham, and upon a review of the transcript of Gorby's May 5, 1981 sentencing hearing, that Gorby's "recommended probationary sentence was not connected in any way with the testimony given in the Wallace case." (*Id.*) Thus, Wallace has not shown that there is clear and convincing evidence of an express or

---

**20.** As the Magistrate Judge explained, Gorby worked as an agent for both the state and federal government in the past. Gorby also appeared to Wallace as a "mere fellow inmate" and not a government agent. Wallace was in "custody" at the time he made his statements to Gorby. And, finally, while Gorby may not have been a "trusted friend" of Wallace's, the two men were familiar with one another.

implicit agreement between Gorby and the Commonwealth, either before, during, or after Wallace's trial.

For all these reasons, and for the reasons set forth in the R & R, the Court concludes that Gorby is not a government agent under *Massiah*.

### (b) Did Gorby Deliberately Elicit Statements From Wallace?

The Court also concludes that Wallace is not entitled to relief on his *Massiah* claim for the separate and distinct reason that he cannot prove that Gorby deliberately elicited any statements from him. *See Matteo,* 171 F.3d at 895; *Kuhlmann v. Wilson,* 477 U.S. 436, 459, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986).

Wallace contends that the Commonwealth intentionally created a situation likely to induce him to make incriminating statements without the assistance of counsel. He argues that all of the "hallmarks" of deliberate elicitation are present. (Dkt. no. 39 at 32). He notes that the government placed Gorby, who worked for it as an informant in an unrelated matter, in a jail cell next to him with the expectation that Gorby would obtain information from him. According to Wallace, the fact that Gorby ultimately obtained incriminating information is evidence that, while there may not have been an express agreement between Gorby and the Commonwealth, there was a tacit implicit, or a "wink and a nod," agreement: Gorby knew what the government wanted him to get and he knew how to get it. (*See* Hearing Tr. at 50–51).

Fundamentally, however, Wallace must show that Gorby took "some action" in an effort to obtain the incriminating statement based upon an express or implicit agreement between Gorby and the Commonwealth. *Kuhlmann,* 477 U.S. at 459, 106 S.Ct. 2616. In this regard, Wallace's counsel conceded at the hearing that simply placing Gorby in a jail cell near Wallace in the hope that Wallace would make an incriminating statement to him, even when coupled with their previous personal relationship, was insufficient to support a finding that Wallace's statements were deliberately elicited. (Hearing Tr. at 50); *See Kuhlmann,* 477 U.S. at 459, 106 S.Ct. 2616; *Matteo,* 171 F.3d at 895–96.

Wallace's attempts to distinguish his case from *Kuhlmann* are unavailing. (*See* Hearing Tr. at 51). The Magistrate Judge thoroughly reviewed the evidence of record and concluded that Wallace has not directed the Court to any evidence that Gorby deliberately elicited statements from Wallace. Moreover, the Magistrate Judge properly analyzed Wallace's contention that Gorby deliberately elicited statements from him under the relevant Supreme Court precedent, including *Kuhlmann, Henry,* and *Matteo,* and found that Gorby's conduct was not violative of Wallace's constitutional rights. We need not further expand upon the Magistrate Judge's thorough review of these issues, except to note that Wallace's counsel conceded at the hearing that Wallace can produce no evidence that the government actively instructed Gorby to elicit information from Wallace. (Hearing Tr. at 51). Thus, here, as in *Kuhlmann,* there is no evidence that the government instructed Gorby to actively obtain a confession, and there is no evidence that Gorby initiated the conversation with Wallace. (Third Trial Tr., at 759). Consequently, Wallace's claim fails. *Kuhlmann,* 477 U.S. at 459, 106 S.Ct. 2616 (the informant must take "some action" in an effort to obtain the incriminating statement); *see also Henry,* 447 U.S. at 271, 100 S.Ct. 2183.

### (c) Conclusion

For the foregoing reasons, the Court overrules Wallace's objections to the Mag-

istrate Judge's recommendation on Wallace's *Massiah* claim and deny him relief on Claim VI of his Amended Petition. However, the Magistrate Judge succinctly discusses why Wallace has made a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), with regard to this claim; therefore, for the reasons set forth in the R & R, the Court grants Wallace a certificate of appealability on this claim.

### SENTENCING–PHASE CLAIMS

#### E. Jury Instruction on Mitigating Evidence

Wallace claims that his Eighth and Fourteenth Amendment rights were violated when the trial court provided ambiguous sentencing-stage instructions suggesting that the jury's determination with respect to mitigating factors had to be unanimous.[21] *See Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). After reviewing the instruction given at the sentencing-stage of Wallace's trial, and analyzing it with respect to the relevant Supreme Court and Third Circuit precedent, the Magistrate Judge determined that the instruction given amounted to a constitutional error. Nevertheless, the Magistrate Judge recommends that the Court deny Wallace federal habeas relief on this claim because the error was harmless.

▮ As the Magistrate Judge thoroughly details in the R & R, the instruction given in Wallace's sentencing-phase trial constituted a constitutional error because, when reviewing the instruction standing alone, there is a reasonable likelihood that the jury would have applied it in a way that prevents the consideration of constitutionally relevant evidence. *See Boyde v. California,* 494 U.S. 370, 380, 110

S.Ct. 1190, 108 L.Ed.2d 316 (1990); *Frey v. Fulcomer,* 132 F.3d 916, 921 (3d Cir. 1997). However, as the Magistrate Judge explains, the Court may not review the challenged error in a vacuum. We must assess the impact, if any, that the error had "on the minds of the jurors in the total setting," *Yohn v. Love,* 76 F.3d 508, 523 (3d Cir.1996), by conducting a *Brecht* harmless error analysis. *Calderon v. Coleman,* 525 U.S. 141, 146–47, 119 S.Ct. 500, 142 L.Ed.2d 521 (1998). Stated differently, once the Court determines that the jury instruction given amounted to a constitutional error, the Court next must analyze the actual effect of the error on the jury's verdict. *Id.* It is as this harmless error stage that Wallace's claim fails. The Court adopts the Magistrate Judge's conclusion that the error was harmless. We write here only to address Wallace's objection to the R & R.

▮ The trial court instructed the jury that it could consider Wallace's lack of a prior significant criminal record and age (25) as mitigating circumstances. (Third Trial Tr. at 1008–11). Wallace contends that, in addition to those two mitigators, the "jurors may have considered [as mitigating evidence] the possibility that Brown was responsible for shooting at least one of the victims" and the "stark sentencing disparity" between the two men (Dkt. no. 39 at 45). According to Wallace, the addition of this third possible mitigating factor bolsters his contention that the constitutionally erroneous sentencing instruction had an actual effect on the jury's sentence. *(Id.; see also* Hearing Tr. at 55–56).

There are at least two problems with this argument. First, it ignores the fact that the jury had already passed on that very point in the guilt-phase of the trial when the jury concluded that it was Wal-

---

**21.** This is Claim XI in Wallace's Amended Petition. (Dkt. no. 12, Claim XI, at 58).

lace, rather than Brown, who shot Spalla. Moreover, Wallace never requested that the jury be instructed to consider Brown's culpability as a mitigating factor, and the trial court never instructed the jury that it could do so. Thus, Brown's culpability in Spalla's murder and the sentencing disparity between Brown and Wallace was not before the jury for consideration.

Under the unique facts of this case— where the two mitigating circumstances presented to the jury were easily proven, undisputed, and therefore de facto treated as conclusive—the Court concurs with the Magistrate Judge that the *Mills* error was harmless. Consequently, the Court overrules Wallace's objection to the Magistrate Judge's recommendation on Claim XI of the Amended Petition, and denies his request for federal habeas relief on this claim. However, for the reasons set forth in full in the R & R, the Court concludes that Wallace has made a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and he is entitled to a certificate of appealability on this claim.

An appropriate Order is attached.

### ORDER

AND NOW this **31st** day of **March 2003**, upon consideration of the Report and Recommendation of the Magistrate Judge, dkt. no. 35, the objections of the parties, dkt. nos. 39–40, Petitioner's objection to Respondent's use of matters not of record, dkt. no. 41, and the complete record in this case, it is hereby ORDERED and DIRECTED that:

1. The Report and Recommendation of the Magistrate Judge, dkt. no. 35, is adopted as the Opinion of the Court as supplemented herein;

2. To the extent that Petitioner seeks relief from his conviction for first-degree murder, his amended petition for habeas corpus relief, dkt. no. 12, is GRANTED;

3. To the extent that Petitioner seeks relief from his remaining convictions, his amended petition for habeas corpus relief, dkt. no. 12, is DENIED;

4. The execution of the writ of habeas corpus is STAYED for 180 days from the date of this Order, during which time the Commonwealth of Pennsylvania may conduct a new trial in a manner consistent with this opinion;

5. After 180 days, should the Commonwealth of Pennsylvania not conduct a new trial, the writ shall issue and the Commonwealth shall vacate Petitioner's conviction for first-degree murder; on all other convictions, he shall remain imprisoned;

6. In accordance with 28 U.S.C. § 2253(c)(2) and W.D. Pa. Local R. 9.4(L), a certificate of appealability is GRANTED on Claims I, II, VI, and XI of the Amended Petition, and DENIED in all other respects;

7. If either party files an appeal to the United States Court of Appeals for the Third Circuit, this Order will be stayed pursuant to W.D. Pa. Local R. 9.4(L);

8. The Clerk of Court shall mark this CASE CLOSED.